UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMORIM HOLDING FINANCEIRA, S.G.P.S., S.A.<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>C. P. BAKER & CO., LTD. and CHRISTOPHER P. BAKER,<br><br>　　　　　Defendants. | Civil Action No. 09-10641 |

## **COMPLAINT**

By and for its complaint against Defendants C. P. Baker & Co., Ltd. and Christopher P. Baker, Plaintiff Amorim Holding Financeira, S.G.P.S., S.A. states as follows:

## **PRELIMINARY STATEMENT**

1.　　　Amorim Holding Financeira, S.G.P.S., S.A. ("Amorim" or the "Company"), with its principal offices in Mozelos, Portugal, brings this action against Boston-based C. P. Baker & Co., Ltd. and Christopher P. Baker seeking compensation for Defendants' violations of the Massachusetts Securities Act, fraud, negligent misrepresentations, breach of fiduciary duty, and unfair and deceptive trade practices in violation of Massachusetts General Laws ch. 93A.  After being induced to rely on Defendants for its United States investments, Amorim lost nearly $30 million of the $34 million Amorim invested—and this at a time of historic prosperity in the United States when the Dow Jones Industrial Average soared to an unprecedented 14,000 points.

2.　　　Amorim is a privately-held family company based in Portugal.  Inexperienced with investment in the United States and with investment in venture capital and private equity in particular, Amorim sought an expert to guide it in such investments.  The Company turned to

1

Defendant Christopher P. Baker ("Baker"), who presented himself and the company of which he

was President and Chief Executive Officer, Defendant C. P. Baker & Co., Ltd. ("C. P. Baker"),

as a successful and sophisticated investment advisor with extensive experience investing in and

managing private equity and venture capital.  Américo Ferreira de Amorim, the head of Amorim,

also developed a close, personal relationship with Baker.  Mr. Amorim believed this was a

relationship of trust and mutual respect.

      3.      Because of its trust in Baker, the Company relied on the information and

investment guidance Baker and his company provided.  This total reliance on Baker was

intensified by the fact that Amorim's principals are non-Americans and non-native English

speakers.  This reliance led Amorim to invest more than $29 million in various start-up

companies and other business ventures at Baker's direction between 2005 and the end of 2007.

In addition to these individual investments, Amorim invested $5 million in the Anasazi Partners

III Offshore Fund, Ltd. (the "Anasazi Fund"), an investment fund that Baker organized, directed,

and managed.  So complete was Amorim's reliance that it was customary that, once Baker told

Amorim it should invest in a company, Amorim would wire the funds from Portugal to Baker in

Boston before receiving any documentation relating to the investment or the subject company.

      4.      Baker, however, repeatedly violated Amorim's trust by misrepresenting the

investments' prospects and Baker's participation in managing the investments.  As but one

example, because certain of the companies in which Amorim was investing were inexperienced

start-ups, Baker repeatedly assured Amorim that he and his company's sizable and experienced

staff would carefully manage the companies in order to facilitate their growth and increase the

value of Amorim's investment.  These assurances, however, were false promises designed to

induce Amorim's total reliance on Baker and to increase Amorim's investments.  In fact, Baker

provided little oversight for these companies and failed to provide the structured management which he had promised and which the companies desperately needed to survive.  To the extent Baker did become involved with the companies, it was only to charge excessive management and consulting fees that lined Baker's own pockets but harmed the companies and Amorim. Further, to induce Amorim's trust in Baker's investment decisions, Baker falsely assured Amorim that he was already involved in managing the investment companies and thus had a reliable and unique insight into the companies' prospects.

5.      What is more, time and again Baker withheld from Amorim critical information about the investment companies and his organization that was material to Baker's ability to manage the companies and to make good on his assurances.  For example, after having lured Amorim to rely on him by lauding his impressive and experienced staff, Baker concealed from Amorim that, in or around the spring of 2007, he terminated nearly all of his employees, leaving nothing but a skeletal staff that was unable to address the management and organizational needs of the investment companies.  It was only in August 2007, on a visit to Boston, that Amorim representatives discovered C. P. Baker's nearly empty offices.

6.      Likewise, after having boasted of his own vast financial and investment experience, and of his sophistication in such matters, Baker concealed from Amorim that, in early 2007, Baker had to pay tens of millions of dollars in back taxes and penalties to the Internal Revenue Service.  Given Amorim's complete reliance on Baker's sophistication and integrity, this was clearly material information that should have been disclosed to Amorim. What is more, Baker's interminable struggles with taxing authorities over his tax obligations contributed to his neglect and mismanagement of the investment companies he had promised to nourish.  It also contributed to Baker's need to charge excessive and unearned fees to those

companies as a source of cash to satisfy his tax obligations.

7.     Baker's concealment of information extended as well to the auditing services Baker had engaged for the Anasazi Fund.  Knowing that at least the appearance of reliable financial information was essential to attracting investors like Amorim, Baker had retained Deloitte & Touche ("Deloitte") to audit the Anasazi Fund.  In 2007, however, after having showcased Deloitte as a reason why Amorim could rely on Baker's advice and management, Baker announced that Deloitte would no longer provide such services due to a personnel conflict that had developed between Baker's organization and Deloitte.  On information and belief, however, Deloitte left not because of any personnel conflict but because it disagreed with accounting practices Baker was employing to artificially inflate the value of the Anasazi Fund's investments and thereby boost his ability to charge increased fees.

8.     On top of all of this, Baker also misrepresented the prospects of the very investment companies he induced Amorim to invest in.  Time and again, Baker presented these investments as having sure and relatively fast returns, some as high as five times the original investment within a single year, when Baker knew or should have known that the investments were in fact highly speculative and extremely risky.  By presenting virtually irresistible gains, Baker repeatedly preyed on Amorin's unfamiliarity with such private investments specifically and with the United States private equity and venture capital markets generally.

9.     As a result of Baker's misrepresentations, omissions, and complete mismanagement of the investment companies, Amorim lost $29 million of the $34 million Baker induced Amorim to invest.  This included a loss of approximately $4 million of the $5 million Amorim invested in the Anasazi Fund, and a loss of approximately $25 million of the $29 million Amorim invested separately from the Anasazi Fund.  These losses occurred during a

period of historic market prosperity in the United States and during a time when the Dow Jones

Industrial Average soared from 11,000 points to an unprecedented high of 14,000 points.

Through this action, Amorim seeks to hold Baker accountable for his breach of Massachusetts

securities laws, fraud, negligent misrepresentations, breach of fiduciary duty, and unfair and

deceptive trade practices.

## PARTIES

10.     Plaintiff Amorim Holding Financeira, S.G.P.S., S.A. ("Amorim" or the

"Company") is a privately-held corporation organized and existing under the laws of the nation

of Portugal.  Its principal offices are located in Mozelos, Portugal.

11.     On information and belief, Defendant C. P. Baker & Company, Ltd. ("C. P.

Baker") is an investment advisor and investment management company.  On information and

belief, C. P. Baker is a Delaware corporation with its principal place of business at 99 High

Street, Boston, Massachusetts.

12.     On information and belief, Defendant Christopher P. Baker ("Baker") is the

President and Chief Executive Officer of C. P. Baker.  On information and belief, Baker resides

in Massachusetts.

## JURISDICTION AND VENUE

13.     This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2)

because the matter in controversy is between citizens of a state and a citizen of a foreign state

and the amount in controversy exceeds $75,000, excluding costs.

14.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(a)(1) because all

defendants reside in the District of Massachusetts.

## FACTUAL BACKGROUND

15.     Amorim is a family-owned and operated business.  The Company was started by members of the Amorim family in the mid-nineteenth century.  The Company's principal enterprise for many years was the harvesting of cork and the manufacture of cork bottle stoppers. Américo Ferreira de Amorim, the head of Amorim, is the grandson of the founders and has worked at the Company for more than fifty years.  As a result of Mr. Amorim's hard work and dedication, the Company grew into a substantial enterprise that expanded beyond the cork industry.  Over time, Mr. Amorim sought to diversify the Company's investments and looked overseas for new investment opportunities.

16.     Because the Company was based in Portugal, Amorim had little experience investing in the United States and was not familiar with United States investment practices.  Nor had the Company previously invested in private equity or venture capital.  When Mr. Amorim first met Baker in 2004, Baker presented himself as an experienced investment advisor and manager who could secure significant investment profits for Amorim.  Mr. Amorim and his staff repeatedly emphasized to Baker that, because they were non-native English speakers unfamiliar with United States investment practices, private equity, or venture capital, and because the investment opportunities Baker was proposing were United States-based, the Company was relying on Baker to select only the most promising investment opportunities and to pre-screen opportunities that were excessively risky or unpromising.  Baker never disagreed with these statements, and in fact encouraged Amorim's complete reliance on his decisions.

17.     Relying on Baker's recommendations, Amorim invested in a series of companies, creating an investment portfolio for Amorim (the "Portfolio Companies").  These investments took several forms, including purchases of stock in a particular company, purchases of

membership units in an LLC, convertible notes, and profit sharing agreements.  Amorim also

invested in the Anasazi Fund that Baker organized, managed, and directed.  Thus, in addition to

investing directly in the Portfolio Companies at Baker's direction, Amorim also invested, at

Baker's direction, in several of the Portfolio Companies through the Anasazi Fund.  While

Amorim made these investments either directly or through its affiliates, all of the resulting losses

have been suffered by Amorim.

18.     On multiple occasions in mid-2005 and 2006, to induce Amorim's reliance and

further investments, Baker promised to keep a close watch on the companies he proposed and to

be actively involved in managing them.  Baker represented that he, together with the ample staff

at C.P. Baker, would be able to provide the management necessary to help these companies—

and hence Amorim's investments—to thrive.  In fact, in mid-2005 and 2006, Baker showcased

his impressive staff of 40 to 50 employees on office tours in Boston and assured Amorim that he

had the necessary man-power to nourish the start-up companies in which he directed Amorim to

invest.  Baker reassured Amorim of this in late 2005 when he false represented to Amorim that

the "idea" companies he had been recommending—companies with valuable ideas but

inexperienced management—would be coached into successful business enterprises at a great

profit to Baker and Amorim.

19.     But Baker's vaunted organization turned out to be no more than stagecraft

designed to create the illusion of a vital and trustworthy enterprise.  In fact, by mid-2007, C.P.

Baker had only a handful of employees.  Although Baker had a duty to inform Amorim of any

material changes to his organization and the impact such changes would have on proper

management of Amorim's investments, Baker concealed this information from Amorim.

Amorim only heard rumors of staff changes from departing C.P. Baker employees and finally

confirmed the virtual evacuation of C.P. Baker when Amorim representatives visited Baker's

near-empty offices in August 2007.  By this time, of course, Baker had already induced Amorim

to invest in the Portfolio Companies and in the Anasazi Fund.  Because these investments were

in mostly private companies with illiquid securities, Amorim was effectively trapped.  Although

it was assured by Baker that these promising companies would flourish under Baker's close

supervision and management, the organizational manpower necessary to provide such guidance

had vanished.

20.     What is more, unbeknownst to Amorim, in 2006 and 2007, Baker was consumed

by a dispute with the Internal Revenue Service over tens of millions of dollars in unpaid taxes

and penalties.  Not only did Baker conceal this from Amorim—its disclosure, of course, would

have conflicted with the carefully groomed image of a sophisticated and trustworthy investment

advisor and financier that Baker presented to Amorim—but Baker's tax problems further

distracted Baker from following through on his obligations to keep a close and careful hand in

the management of the companies in which he had Amorim invest.

21.     On top of everything else, and likely as a source of funds to satisfy his tax

obligations, Baker engaged in various schemes that were designed to enrich himself at the

expense of Amorim.  For example, on information and belief, in addition to management fees

Baker charged the Anasazi Fund, Baker also charged excessive and above-market management

and consultancy fees to the investment companies.  Not only were these fees for managing or

consulting services that never or rarely occurred, but the fees Baker charged quickly depleted the

investment companies of necessary operating capital—the very capital Baker was directing

Amorim to *put into* the companies in the first place.  Further, when an investment company

could not pay Baker's excessive consultancy fees, Baker would take shares of the company's

stock instead, thereby enlarging his own holdings at Amorim's expense.

22.     Further, Baker repeatedly took advantage of Amorim's complete faith in him by using Amorim as an unwitting pawn in his scheme to artificially inflate the value of the companies, so as to boost his management fees (which were tied to the investments' performance) and also dupe other investors to invest in the companies.  For example, because of Amorim's inexperience in valuing private equity and venture capital stakes and its total reliance on Baker, Amorim would rely on Baker to set the value of the companies in which Amorim was investing and thus the percentage ownership Amorim's investment could purchase.  Once Baker had tricked Amorim into accepting an aggressive and unjustified valuation, he would use that acceptance as evidence of the company's value, thereby increasing the amount of management fees he could charge.  In fact, on information and belief, Deloitte, which was the auditor of the Anasazi Fund, resigned from that position in 2007 because it would not accept Baker's fictitious and self-serving valuations.  Baker, however, concealed this fact by claiming that Deloitte resigned because of a personal relationship between someone on Baker's staff and someone at Deloitte.

23.     Baker's schemes for siphoning cash from the investment companies extended as well to brokerage fees Baker charged the investment companies.  Whenever Baker induced Amorim to invest in an investment company, Baker would charge that company a brokerage fee. Not only was this an obvious conflict of interest in that Baker's oral assurances led Amorim to believe he was looking out solely for Amorim's interests, but the arrangement was simply another method by which Baker bled the investment companies of essential capital.

24.     In addition, and as a further method of inducing Amorim's faith in Baker's investment decisions, Baker made false and misleading statements concerning the Portfolio

Companies themselves.  For example, at Baker's direction and relying on Baker's false assurance that Baker and his organization would provide top-flight management expertise, Amorim invested in Chime Entertainment, LLC ("Chime") in August 2005.  Baker also assured Amorim that any investment in Chime would have a minimum return of five times the initial investment within 24-36 months.  Relying on these assurances, Amorim invested $1.5 million in Chime.  On information and belief, Baker knew or should have known that Chime, particularly given its flawed and inexperienced management, had no realistic prospects of earning the returns Baker promised, and Baker knew or should have known that his representations about Chime were false and/or misleading.

25.     Further, during a meeting with Amorim in July 2006, Baker represented that he had secured additional sources of investment in Chime, which would further improve the likely success of the business.  Relying on this representation and believing that other investors had faith in Chime and would provide the additional financing necessary for the company's success, Amorim invested an additional $500,000.  In fact, however, Baker did not have any additional investment sources for Chime.  By 2007, Chime was in ruins.  The value of Amorim's investment was near zero and Amorim lost approximately $2 million as a result of this investment.

26.     In addition, Baker allowed start-up companies like Chime to become active without ensuring that they had secured sufficient investment capital to meet their needs.  This had the effect of destroying Amorim's investment because, without sufficient capital, the initial, inadequate investment would be quickly exhausted without any hope that the company would achieve the goals that adequate capitalization was designed to assure.  For example, Baker authorized Chime to begin business with $5 million in capital when the company's business plan

clearly required $10 million.  This destroyed the ultimate value of Amorim's investment in

Chime, and was one of the reasons why Baker knew or should have known that his promised

swift returns were unreliable and his promises of careful management were false.

27.     Similar problems occurred at a company called MySky Communications, Inc.

("MySky").  In July 2006, Baker told Amorim that it should invest in MySky.  Believing that

Baker was pre-selecting only investments with assured profits and without excessive risks,

Amorim invested in the company.  MySky's business plan called for initial capital needs of $1.5

million before the company began business.  Despite his awareness of this business plan, Baker

allowed MySky to begin business with only $700,000 in capital, which virtually assured

MySky's failure and the loss of Amorim's investment.  In Boston in January 2007, and with the

intent to keep Amorim invested in MySky, Baker told Amorim that its investment would yield a

return by the end of 2009 of two times the initial investment.  Despite these representations, the

company was soon on the verge of bankruptcy.

28.     American Entertainment Holding Company, LLC ("AEHC") was another of the

Portfolio Companies Baker directed Amorim to invest in.  According to Baker, AEHC was a

company that planned to profit from copyrights in the film industry.  In June 2005, Baker told

Amorim that AEHC was an excellent investment because it was the type of deal that always

makes money.  He assured Amorim that American movie stars Michael Douglas and Catherine

Zeta-Jones were deeply involved in the project.  He also assured Amorim that a "film fund" of

$100 million was being arranged to finance films from AEHC's warehouse of copyrights, and

that Mr. Douglas and Ms. Zeta-Jones would act in those films.  Based on these representations,

Amorim invested $2.5 million in AEHC.  On information and belief, Baker knew or should have

known that his representations about the extent of Mr. Douglas's and Ms. Zeta-Jones's

involvement in AEHC and the availability of a "film fund" were false and misleading.

29.     Baker followed these false statements with additional false representations designed to keep Amorim from attempting to pull its investment out of AEHC.  During a meeting in July 2006, Baker told Amorim that AEHC would have an initial public offering in "the very short term."  A few months later, in Lisbon, Portugal in October 2006, Baker represented to Amorim that he anticipated an IPO in June 2007.  In Boston in January 2007, however, Baker told Amorim that an IPO was anticipated for late 2007 or early 2008.  In fact, Baker knew or should have known at the time that AEHC had virtually no revenue and was not in any position for an imminent IPO.  Baker made these statements with the intent to induce Amorim to remain invested in AEHC, even though such investment was not in Amorim's best interest at the time.  AEHC is now near bankruptcy, and Amorim has lost approximately half the value of its investment, or about $1.25 million.

30.     At a meeting in Boston in May 2006, Baker directed Amorim to invest in On-Card, Inc. ("On-Card"), assuring Amorim that the company would have an IPO within 24 months leading to a return of two to five times Amorim's initial investment.  Baker also told Amorim that another company had already offered to buy On-Card but that the offer was inadequate.  On information and belief, Baker knew or should have known that these representations were false and that an IPO of On-Card was never imminent because OnCard barely broke even and had no ability for growth.  Based on Baker's representations, Amorim invested approximately $1.9 million in On-Card.

31.     After Amorim's initial investment, Amorim became dissatisfied with what appeared to be evidence of poor management at On-Card.  In response to Amorim's concerns, and in an effort to induce Amorim to remain committed to On-Card, Baker assured Amorim in

late 2006 that he would remove the On-Card Chief Executive Officer and replace him with a more experienced CEO in order to improve the management of the company.  Despite this representation, Baker did not replace the On-Card CEO and had no intention of doing so. Ultimately, Amorim lost $1.7 million of its $1.9 million investment in On-Card.

32.     In December 2004, at a meeting in Boston, Baker recommended that Amorim invest $900,000 in Z-Force Enterprises, LLC ("Z-Force Enterprises"), a film production company, through another Z-Force entity.  In May 2006, Baker represented that Amorim would see a minimum return of two times its initial investment within two to three years.  On information and belief, Baker knew or should have known that the company had no such prospects and made these representations solely to keep Amorim from trying to pull its investments out of Z-Force Enterprises and other Portfolio Companies.  In fact, only two months later, at a meeting in Newport, Rhode Island in July 2006, Amorim learned that Z-Force Enterprises had been experiencing difficulties and told Baker that Amorim was concerned about management of the struggling company.  In response, in October 2006, Baker promised to replace the management of Z-Force Enterprises' parent company, Earthworks, within three months.  On information and belief, Baker did not do so, had no intention of doing so, and did not make reasonable efforts to attempt to do so.  Amorim lost its entire $900,000 investment in Z-Force Enterprises.

33.     Additionally, on Baker's recommendation, Amorim invested $2 million in One IP Voice, Inc. ("One IP Voice") in or around March 2006.  Amorim made this investment based on assurances from Baker that the investment would yield a five-fold return within ten months. Baker knew or should have known that such swift returns were unrealistic.  Eight months later (and two months before the return was expected), One IP Voice declared bankruptcy and

Amorim lost its entire $2 million investment.

34.     In each instance, Amorim relied on Baker's false assurances in deciding to make—and hold—its investments.  Although written documentation for certain of the investments generally contained boilerplate disclaimers, Amorim's reliance was reasonable and justifiable in light of Baker's asserted expertise and intimate knowledge of the start-up companies, Amorim's inexperience with United States private equity and venture capital, and the special relationship of trust and confidence between them.  In fact, given Amorim's relationship with and trust in Baker, it was not uncommon for Amorim to wire payment for its investments before even receiving the written documentation.

35.     In late 2007, as Amorim began to realize that its investments were not as represented, Amorim told Baker it expected Baker to make good on at least some of the losses Amorim had sustained at Baker's hands.  Although Baker assured Amorim that he would do so, in reality, Baker concocted a scheme that was designed not to reimburse Amorim but to protect Baker's own massive investment in a company called Remote MDx, Inc. ("Remote MDx").  Baker's self-serving scheme caused Amorim to lose $17.5 million of the $18.5 million Amorim invested.

36.     The scheme worked like this:  in November 2007, Baker proposed that Amorim invest $18.5 million to purchase shares in Remote MDx that would be sold six months later as a "put" at a guaranteed, increased price to Vatas Holding GmbH ("Vatas"), a German company.  Baker told Amorim that profits from this investment would be $3 million.  Baker represented that this was a risk-free investment with a virtually guaranteed return.  He told Amorim that he was offering Amorim this extraordinary opportunity to compensate Amorin for prior investment losses it had incurred based on Baker's recommendations.  Indeed, Baker told Amorim that this

investment was so unique that Amorim should not tell anyone about it—even the few remaining employees at C. P. Baker—for fear that others would want to become involved.

37.      Unbeknownst to Amorim, however, Baker arranged Amorim's investment solely in an attempt to protect his own investment in Remote MDx.  What Baker concealed from Amorim was that a market-maker in Remote MDx stock was preparing to sell a huge block of Remote MDx stock.  This flooding of the market risked diluting the value of Remote MDx shares, which would dilute the value of Baker's own holdings in Remote MDx.  Thus, Baker arranged to have Amorim—and, unbeknownst to Amorim, other entities—purchase Remote MDx stock so as to eliminate the dilution that would have occurred.  After Amorim invested $18.5 million to buy the Remote MDx shares, Vatas refused to honor the put and then declared insolvency.

38.      On information and belief, Baker knew or should have known that the Remote MDx deal was not a good investment for Amorim and was not as safe as he claimed it would be. Baker also knew but failed to disclose to Amorim that Vatas was an unstable company and its CEO had been involved in bankruptcies before and was being investigated by government authorities.  On information and belief, Baker also knew or should have known that Vatas had in fact overextended itself by committing to similar put arrangements with other investors.  At a minimum, Baker was completely conflicted when he used Amorim as an unwitting pawn to protect the value of Baker's own investment in Remote MDx.

39.      Amorim lost approximately $17.5 million on the Remote MDx investment.

## COUNT I: VIOLATION OF M.G.L. Ch. 110A § 410

40.      Amorim hereby realleges paragraphs 1 through 39.

41.      Amorim's investments in the Portfolio Companies and the Anasazi Fund

constituted "securities" as defined by M.G.L. ch. 110A §401.

42.    Defendants sold and/or materially aided in the sale of securities in Massachusetts to Amorim.

43.    In the course of selling these securities to Amorim, Defendants made factual misrepresentations and omitted relevant, material facts.

44.    Amorim was unaware of Defendants' material misrepresentations and omissions.

45.    Defendants knew or in the exercise of reasonable care should have known that material facts were misstated and/or omitted.

46.    Amorim was induced to purchase, hold, and refrain from selling securities in the Portfolio Companies and in the Anasazi Fund in reliance on Defendants' misstatements and/or omissions.

47.    As a direct and proximate result of their reliance on Defendants' misstatements and/or omissions, Amorim suffered damages.

## COUNT II: FRAUD

48.    Amorim hereby realleges paragraphs 1 through 47.

49.    Defendants made material misrepresentations and/or omissions to induce Amorim to invest in the Portfolio Companies and the Anasazi Fund, and to induce Amorim to refrain from taking steps to withdraw or dispose of its investments in the Portfolio Companies and the Anasazi Fund.  Defendants knew or should have known that these statements were false and/or misleading.

50.    As a direct and proximate result of their reliance on Defendants' false representations and omissions, Amorim invested nearly $34 million in the Portfolio Companies and the Anasazi Fund and suffered damages.  Had Amorim known that Defendants' statements

were untrue and/or known the material information that Defendants did not disclose, Amorim

would not have made these investments and/or would have taken steps to withdraw investments

already made or otherwise protect itself.

## COUNT III: NEGLIGENT MISREPRESENTATION

51.     Amorim hereby realleges paragraphs 1 through 50.

52.     Defendants made material misrepresentations and/or omissions to induce Amorim

to invest in the Portfolio Companies and the Anasazi Fund, and to induce Amorim to refrain

from taking steps to withdraw or dispose of its investments in the Portfolio Companies and the

Anasazi Fund.  On information and belief, Defendants knew or should have known that these

statements were false and/or misleading.

53.     Defendants failed to exercise reasonable care in evaluating the truth of its

statements before providing the information to Amorim.

54.     Amorim had no knowledge that Defendants' statements and omissions were false

and reasonably relied on them when investing in the Portfolio Companies and the Anasazi Fund.

Had Amorim known that Defendants' statements were untrue and/or known the material

information that Defendants did not disclose, Amorim would not have made these investments

and/or would have taken steps to withdraw investments already made or otherwise protect itself.

55.     As a direct and proximate result of Defendants' negligent misrepresentations,

Amorim suffered damages.

## COUNT IV: BREACH OF FIDUCIARY DUTY

56.     Amorim hereby realleges paragraphs 1 through 55.

57.     Defendants had and exercised complete discretion in choosing investments for

Amorim, and Amorim, inexperienced and unsophisticated in United States private equity and

venture capital investing, trusted and relied upon Defendants in selecting suitable investments.

58.     Because of this relationship of trust and confidence, Defendants owed fiduciary duties to Amorim and a heightened duty to make honest disclosures.

59.     Defendants breached their fiduciary duties to Amorim by, among other things, providing Amorim with information that Defendants knew or should have known to be false about the prospects of the companies in which Amorim invested; failing to adequately manage the companies in which Amorim invested; failing to provide Amorim with complete, truthful information about the likely success of proposed investments and about Baker's own organization; and acting in conflict with Amorin's interests by charging excessive and unearned management and consulting fees and by using Amorim as a pawn in their scheme to enrich themselves.

60.     As a direct and proximate result of Defendants' breaches of fiduciary duty, Amorim suffered damages.

## COUNT V: VIOLATION OF M.G.L. Ch. 93A

61.     Amorim hereby realleges paragraphs 1 through 60.

62.     Plaintiff and Defendants are persons who engage in "trade or commerce" within the meaning of Massachusetts General Laws ch. 93A.

63.     Defendants' interactions with Amorim constitute "unfair or deceptive acts or practices" within the meaning of Massachusetts General Laws ch. 93A § 2.

64.     Defendants' actions occurred primarily and substantially within the Commonwealth of Massachusetts in that most of the misrepresented information emanated from Baker's offices in Boston, Massachusetts and, on several occasions, was presented to Amorim on visits to those Boston offices.

65.     Defendants' actions, which caused Amorim to suffer harm, constituted a willful or knowing violation of Massachusetts General Laws ch. 93A.

66.     Amorim is entitled to three times the actual damages caused by Defendants' actions, which will be established at trial, as well as the reasonable costs and attorneys' fees incurred in prosecuting this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Amorim Holding Financeira, S.G.P.S., S.A. respectfully requests that this Court order the following relief:

1.  Award Amorim approximately $29 million in damages, or whatever actual damages are established at trial, to compensate it for the investment losses caused by Defendants' conduct.

2.  Award Amorim treble damages, attorneys' fees, and costs as a result of Defendants' unfair and deceptive trade practices in violation of Massachusetts General Laws ch. 93A.

3.  Award such further relief as this Court deems just and proper.

## REQUEST FOR JURY TRIAL

Plaintiff hereby requests that this case be tried before a jury on all counts so triable.

Dated: April 21, 2009

Respectfully submitted,

Amorim Holding Financeira, S.G.P.S., S.A.

By its attorneys,

/s/ Anthony S. Fiotto
Anthony S. Fiotto (BBO #558089)
Brian C. Devine (BBO #672233)
Laura E. Rosenbaum (BBO #663412)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts  02109
Tel.:  617.570.1000
Fax:  617.523.1231
E-Mail:  afiotto@goodwinprocter.com
          bdevine@goodwinprocter.com
          lrosenbaum@goodwinprocter.com