## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMORIM HOLDING FINANCEIRA,<br>S.G.P.S., S.A.<br><br>   Plaintiff,<br><br>   v.<br><br>C. P. BAKER & CO., LTD. and<br>CHRISTOPHER P. BAKER,<br><br>   Defendants. | Civil Action No. 09-10641-NG |

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE
## PURSUANT TO THE 18 MARCH 1970 HAGUE CONVENTION ON THE
## TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS

The United States District Court for the District of Massachusetts ("the District Court") presents its compliments to the Senior Master of the Supreme Court of Judicature, Queen's Bench Division, and requests assistance in obtaining evidence to be used in civil proceedings before this Court in the above-captioned matter.

The District Court requests that the Senior Master approve the Defendant's nomination of a practicing Barrister or such other qualified person as the Court deems fit, to act as Examiner for the purpose of obtaining oral testimony and documents for trial from non-party witness, Mr. Lars Windhorst.

This request is made pursuant to, and in conformity with, Chapter I of the *18 March 1970 Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters* ("the Hague Convention"), to which both the United States and the United Kingdom are a party, and Rules 28 and 30 of the United States Federal Rules of Civil Procedure.

The District Court asserts that the documents and testimony sought are directly relevant to the issues in dispute, are necessary for purposes of trial, and are not discovery within the meaning of Article 23 of the Hague Convention. This Request fully complies with reservations made by the United Kingdom under the Hague Convention. It is expected, based on existing timetables, that the District Court will schedule trial on or about the fourth quarter of 2011.

The particulars of this Hague Evidence Request are as follows:

| | |
|---|---|
| *1. Sender* | The Honorable Leo T. Sorokin<br>United States Magistrate Judge<br>United States District Court for the<br>District of Massachusetts<br>John Joseph Moakley U.S. Courthouse<br>1 Courthouse Way, Suite 2300<br>Boston, Massachusetts 02210<br>USA |
| | *(Civil Action No. 09-10641-NG)* |
| *2. Central Authority of the Requested State:* | COMPETENT AUTHORITY FOR ENGLAND<br>AND WALES<br>Senior Master of the Supreme Court of Judicature<br>Queen's Bench Division<br>ROYAL COURTS OF JUSTICE<br>Strand<br>London WC2A 2LL<br>UNITED KINGDOM |
| | *On behalf of:* |
| | THE CENTRAL AUTHORITY FOR THE<br>UNITED KINGDOM<br>Her Majesty's Principal Secretary of State for<br>Foreign Affairs<br>FOREIGN AND COMMONWEALTH OFFICE<br>King Charles Street<br>London SW1A 2AH, England,<br>UNITED KINGDOM |

2

*3. Person to whom the executed request is to be returned:*

*Plaintiff's UK Legal Representative:*

Steven Loble, Esq.
FINERS STEPHENS INNOCENT
179 Great Portland Street
London W1W 5LS
UNITED KINGDOM
Tel.: +44 (0) 20 7344 5532
Fax: +44 (0) 20 7580 7069
Email: steven.loble@fsilaw.com

*on behalf of:*

The Honorable Leo T. Sorokin
United States Magistrate Judge
United States District Court for the
District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, Massachusetts 02210
USA

*4. In conformity with Article 3 of the Convention, the undersigned applicant has the honor to submit the following request:*

*5a.  Requesting judicial authority:*

The Honorable Leo T. Sorokin
United States Magistrate Judge
United States District Court for the
District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, Massachusetts 02210
USA

*5b.  To the competent authority of:*

THE UNITED KINGDOM OF GREAT
BRITAIN AND NORTHERN IRELAND

*6. Names and addresses of the parties and their representatives:*

*a.      Plaintiff*

Amorim Holding Financeira, S.G.P.S., S.A.
Rua da Corticeira, No. 34
Aparto 47
Mozelos VFR
4356-902
PORTUGAL

3

*Plaintiff's U.S. Legal Representatives:*

Anthony S. Fiotto, Esq.
Damian W. Wilmot, Esq.
Karen G. Hong, Esq.
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
USA
Tel.: +1 (617) 570-1000
Fax: +1 (617) 523-1231
Email: AFiotto@goodwinprocter.com
          DWilmot@goodwinprocter.com
          KHong@goodwinprocter.com

*Plaintiff's U.K. Legal Representative:*

Steven Loble, Esq.
FINERS STEPHENS INNOCENT
179 Great Portland Street
London W1W 5LS
UNITED KINGDOM
Tel.: +44 (0) 20 7344 5532
Fax: +44 (0 )20 7580 7069
Email: steven.loble@fsilaw.com

| | | |
|---|---|---|
| *b.* | *Defendant 1* | C.P. Baker & Co., Ltd.<br>10 High Street<br>Suite 502<br>Boston, Massachusetts 02110<br>USA |
| *c.* | *Defendant 2* | Christopher P. Baker<br>c/o C.P. Baker & Co., Ltd.<br>10 High Street<br>Suite 502<br>Boston, Massachusetts 02110<br>USA |

4

*Defendants' U.S. Legal Representatives:*

Daniel J. Dwyer, Esq.
MURPHY & KING, PC
One Beacon Street
Boston, Massachusetts 02108
USA
Tel.: +1 (617) 423-0400
Fax: +1 (617) 423-0498
Email: djd@murphyking.com

7.      *Nature and purpose of the proceedings and summary of the facts:*

This is a civil action, filed by Plaintiff/Counter Defendant Amorim Holdings Financeira,

S.G.P.S., S.A. against Defendant/Counter Claimant C.P. Baker & Co., Ltd. and

Defendant/Counter Claimant Christopher P. Baker, seeking compensation for Defendants'

alleged fraud, negligent misrepresentations, breach of fiduciary duty, violations of the

Massachusetts Securities Act, and unfair and deceptive trade practices in violation of

Massachusetts General Laws, ch. 93A.

## PARTIES

Amorim Holdings Financeira, S.G.P.S., S.A. ("Amorim" or "Plaintiff") is a privately-

held corporation organized and existing under the laws of Portugal.  Its principal offices are

located in Mozelos, Portugal.

C.P. Baker & Co., Ltd. ("CPB") is a Delaware corporation with its principal place of

business at 10 High Street, Boston, Massachusetts, USA.

Christopher P. Baker ("Baker") is President and Chief Executive Officer of CPB, and is a

resident of the State of Massachusetts.

5

## SUMMARY OF PLAINTIFF'S COMPLAINT

In its *Complaint*, Amorim, a family-owned business based in Portugal, alleges that after being induced to rely on Defendants Baker and CPB for its United States investments, it lost nearly US$30 million of the US$34 million Amorim entrusted to Defendants-- at the same time that the Dow Jones Industrial Average rose to an unprecedented high of 14,000 points.

Amorim alleges that it was induced into utilizing Defendants' investment services because of Defendants' representations that they were successful and sophisticated investment advisors with extensive experience investing in and managing private equity and venture capital in the United States. Americo Ferreira de Amorim, the head of Amorim, also developed a close, personal relationship with Baker. Because of its trust in Baker, Amorim relied on information and investment guidance Baker and his company, CPB, provided. This reliance led Amorim to invest more than US$29 million in various start-up companies and other business ventures at Baker's direction between 2005 and the end of 2007. In addition to these individual investments, Amorim invested an additional US$5 million in the Anasazi Partners III Offshore Fund, Ltd., an investment fund that Baker organized, directed, and managed.

Amorim alleges that Defendants repeatedly violated Amorim's trust by misrepresenting the investment companies' health, plans, and prospects and by misrepresenting Defendants' participation in managing those investments. Amorim alleges that, despite repeated assurances by Baker that he and his company's sizable and experienced staff would carefully manage the investment companies to nourish their growth and increase the value of Amorim's investment, Baker, in fact, provided little oversight and failed to provide the structured management he had promised and the investment companies desperately needed to survive.

Amorim further asserts that Baker concealed from Amorim that, in early 2007, Baker had to pay tens of millions of dollars in back taxes and penalties to the Internal Revenue Service. Amorim believes that Baker was under pressure to find a source of funds to satisfy these tax obligations, and attempted to enrich himself at the expense of Amorim.

Amorim claims that by mid-2007, only a handful of employees remained at CPB. By then, Amorim asserts, because its investments were in mostly private companies with illiquid securities, Amorim was effectively trapped.

In late 2007, Amorim was so alarmed by the losses it was suffering due to Baker's actions and omissions that it demanded compensation. Amorim claims that to help compensate for Amorim's prior losses, Defendants advised Amorim to buy US$18.5 million worth of shares of Remote MDx, Inc. ("RemoteMDx"), a public company, assuring Amorim that the shares were to be sold as a "put" at a guaranteed, increased price to VATAS Holding GmbH ("VATAS"), a German company.

Amorim alleges that Baker told Amorim that profits from this investment would be US$3 million. Amorim further alleges that Baker represented that this was a risk-free investment with a virtually guaranteed return. Amorim alleges that Baker represented that Baker was offering Amorim this extraordinary opportunity to compensate Amorim for prior investment losses it had incurred based upon Baker's recommendations. Amorim alleges that Baker told Amorim that this investment was so unique that Amorim should not tell anyone about it for fear that others would want to become involved.

Amorim alleges that this advice was actually part of Defendants' scheme to use the investments of Amorim and other investors as a tool to protect Baker's own sizable investment in RemoteMDx. Amorim asserts that Defendants concealed that a "market-maker" was

7

preparing to sell a huge block of such shares, thereby diluting Baker's holdings. Amorim alleges that Defendants arranged to have Amorim—and, unbeknownst to Amorim, numerous other parties—purchase RemoteMDx shares so as to minimize the dilution. According to Amorim, after Amorim had invested US$18.5 million, VATAS, barraged by other puts arranged by Defendants, refused to honor the puts and declared insolvency. Amorim claims that it lost US$17.5 million in Defendants' scheme.

Amorim alleges that Baker knew, but failed to disclose to Amorim, that VATAS was an unstable company, that its managing director, Lars Windhorst, had been involved in previous bankruptcies, and that he was being investigated by German government authorities. Amorim alleges that Baker also knew or should have known that VATAS had overextended itself by committing to similar put arrangements with other investors. Amorim alleges that Defendants failed to disclose serious conflicts of interest between the financial interests of Defendants and those of Amorim, attributable to Defendants' substantial personal investment in VATAS.

Amorim alleges fraud, negligent misrepresentation, breach of fiduciary duty, and unfair and deceptive trade practices in violation of Massachusetts securities laws.

Plaintiff seeks an award of approximately US$29 million in damages, or whatever actual damages are established at trial, treble damages, attorneys' fees, costs of suit and such further relief as this District Court deems just and proper.


## SUMMARY OF DEFENDANTS' ANSWERS, DEFENSES, AND COUNTERCLAIMS

Defendants largely deny Plaintiff's claims and assert the following affirmative defenses: (1) that Defendants did not make the misrepresentations alleged in the *Complaint;* (2) that Amorim did not invest completely in reliance on Defendants' recommendations without itself

investigating the merits of the investments; and (3) that Amorim's claims are barred and waived by the risk disclosures contained in the investment contracts that Amorim signed. Defendants assert three counterclaims against Amorim: (1) misrepresentation; (2) breach of warranty; and (3) indemnification. Defendants allege that Amorim signed the investment contracts, claiming to be a sophisticated investor, but having suffered losses, Amorim is now claiming to be an unsophisticated investor.

## STAGE OF THE PROCEEDINGS

On April 21, 2009, Amorim filed its *Complaint*. Defendants filed their *Answers and Counterclaims* on February 11, 2010. On March 26, 2010, Amorim filed its *Reply* to Defendants' *Counterclaims*.

The parties began exchanging requests for production of documents in October 2009 and more than 40,850 pages of documents have been produced by and between the parties to date. Additionally, the parties have conducted 10 depositions of both party and non-party witnesses. On March 3, 2010, the District Court issued an Order granting the parties' *Motion for Entry of a Confidentiality Order*.

It is expected, based on existing timetables, that the District Court will schedule trial on or about the fourth quarter of 2011.

### 8.    *Evidence to be Obtained:*

## WITNESS FROM WHOM EVIDENCE IS SOUGHT

Plaintiff Amorim seeks documents and oral testimony for trial from non-party witness Lars Windhorst, a German national now resident in London.

9

Mr. Windhorst was the former managing director of VATAS, the German company which was purportedly prepared to purchase public shares of RemoteMDx from Amorim as a "put" at a guaranteed, increased price. Mr. Windhorst served at VATAS from 2006 through 2008, the time period directly relevant to the allegations in this case.

In 2009, VATAS (headquartered in Berlin, Germany) filed for bankruptcy after NORD/LB Norddeutsche Landesbank sued VATAS for approximately 150 million euros.

In 1996, Norddeutsche Landesbank Girozentrale filed criminal charges against Mr. Windhorst with the Berlin Pubic Prosecutor's Office, resulting in a trial and plea agreement.

Mr. Windhorst is currently residing and working in London as CEO of Sapinda UK Limited.


## RELEVANCE OF THE EVIDENCE SOUGHT

Amorim has asserted that in late 2007 Baker assured Amorim that he would make good on some of the losses Amorim had sustained at Baker's hand and thus proposed that Amorim invest US$18.5 million to purchase shares in RemoteMDx that would be sold six months later as a "put" at a guaranteed, increased price to VATAS. Amorim alleges that Baker told Amorim that profits from this investment would be US$3 million and that the investment was a risk-free investment with a virtually guaranteed return. Amorim asserts that Baker knew or should have known that such representations were false. Amorim asserts that Baker also knew but failed to disclose to Amorim that VATAS was an unstable company, that Mr. Windhorst, its CEO, had been involved in previous bankruptcies and was being investigated by the German government authorities, that a market-maker in RemoteMDx stock was preparing to sell a huge block of RemoteMDx stock, and that VATAS had in fact overextended itself by committing to similar put

arrangements with other investors. Amorim asserts that, at a minimum, Baker was completely conflicted when he used Amorim as an unwitting pawn to protect the value of Baker's own investment in RemoteMDx.

Amorim further asserts that based upon information contained pleadings that are part of the public record in *Alki Partners, L.P. and Alki Fund, Ltd. v. VATAS Holding GmbH, Lars Windhorst, Peter A. Ogrisek, Sapinda International Ltd., Robert B. Hersov, Credit Suisse Group AG, and Frederic Ruiz* (U.S. Dist. Ct., S.D.N.Y., Case No. 09 Civ. 8125), there is evidence that VATAS had committed to similar put arrangements with other investors and similarly led investors to believe that the investment was unique and exclusive. *See Key Document 3 of Annex A.* In addition, Amorim has since learned through publically available documents that VATAS entered into put arrangements with Vezla Ltd., a Hungarian corporation, Raiffeisenbank, a Russian corporation, and Ringturm Capital, an Austrian corporation.

Mr. Windhorst, as managing director of VATAS, played a central role in these investment schemes. Plaintiff believes that Mr. Windhorst is able to produce documents about the nature of the put agreements between VATAS and Amorim and other investors.

Plaintiff further believes that Mr. Windhorst is able to provide testimony, for use at trial, relating to VATAS' financial position in 2007 and 2008, VATAS' CEO and his previous companies' history of financial difficulties, and that VATAS was entering into several put arrangements with other investors in addition to Amorim. Plaintiff believes that Mr. Windhorst's testimony can also provide evidence about Defendants promotion of the purchase of RemoteMDx shares and Defendants' failure to disclose their own shares in VATAS as a potential source of conflict of interest.

For the reasons set forth above, the District Court believes that the witness (whose

contact details are given below) will be able to provide evidence directly relevant to the main issues in dispute between the parties and without which the ends of justice could not be properly met.  The District Court believes that this information is not available from any other source.

## DOCUMENTS SOUGHT FOR PRODUCTION

    1.    The draft of the put agreement between VATAS and Amorim, referenced in the January 7, 2008 e-mail from Lars Windhorst to Chris Baker,  that gave Amorim the right to sell the RemoteMDx shares to VATAS at a specified price.

    *(See in particular Key Document 2D of "Annex A".)*

    2.    The 2007 put agreement between VATAS and Alki Partners, L.P. /Alki Fund, Ltd. that gave the investors the right to sell the RemoteMDx shares to VATAS at a specified price.

    *(See in particular Key Document 3 of "Annex A".)*

    3.    The put agreement made in or around 2008 between VATAS and Vezla Ltd. that gave the investors the right to sell the RemoteMDx shares to VATAS at a specified price.

    4.    The put agreement made in or around 2008 between VATAS and Raiffeisenbank that gave the investors the right to sell the RemoteMDx shares to VATAS at a specified price.

    5.    The put agreement made in or around 2008 between VATAS and Ringturm Capital that gave the investors the right to sell the RemoteMDx shares to VATAS at a specified price.

## SUBJECT MATTERS FOR ORAL EXAMINATION

Plaintiff seeks to question Mr. Windhorst with respect to the following subject matters:

1. The discussions surrounding the put agreement that VATAS entered into with investors Vezla Ltd. in 2007-2008 which gave investors the right to sell the RemoteMDx shares they purchased to VATAS at a specified price.

2. The discussions surrounding the put agreement that VATAS entered into with investors Raiffeisenbank in 2007-2008 which gave investors the right to sell the RemoteMDx shares they purchased to VATAS at a specified price.

3. The discussions surrounding the put agreement that VATAS entered into with investors Ringturm Capital in 2007-2008 which gave investors the right to sell the RemoteMDx shares they purchased to VATAS at a specified price.

4. The discussions surrounding the put agreement that VATAS entered into with investors ALKI Partners LP/ALKI Fund Ltd. in 2007 which gave investors the right to sell the RemoteMDx shares they purchased to VATAS at a specified price.

5. The business relationship between Windhorst and VATAS.

6. The business relationship between RemoteMDx and VATAS.

7. The business relationship between RemoteMDX and Windhorst.

8. The number of shares Windhorst or VATAS owned in RemoteMDx from 2006-2008.

9. The circumstances surrounding the creation, negotiation and execution of the put agreement between Amorim and VATAS entered into on January 25, 2008 concerning RemoteMDx shares.

10.     The negotiations regarding the drafting of the put agreement between Amorim and VATAS entered into in 2008 concerning RemoteMDx shares.

11.     The business relationship between Windhorst and C.P. Baker & Co., Ltd.

12.     The business relationship between Windhorst and C.P. Baker Securities, Inc.

13.     The business relationship between Windhorst and C.P. Baker, LLC.

14.     The business relationship between Windhorst and Christopher Baker.

15.     The business relationship between VATAS and C.P. Baker & Co., Ltd.

16.     The business relationship between VATAS and C.P. Baker Securities, Inc.

17.     The business relationship between VATAS and C.P. Baker, LLC.

18.     The business relationship between VATAS and Christopher Baker.

19.     The business relationship between RemoteMDx and C.P. Baker & Co., Ltd.

20.     The business relationship between RemoteMDx and C.P. Baker Securities, Inc.

21.     The business relationship between RemoteMDx and C.P. Baker, LLC.

22.     The business relationship between RemoteMDx and Christopher Baker.

23.     The circumstances surrounding Lars Windhorst's introduction to Amorim.

24.     The circumstances surrounding Lars Windhorst's introduction to C.P. Baker & Co., Ltd., C.P. Baker Securities, Inc., C.P. Baker, LLC, and Christopher Baker.

25.     The discussions between Windhorst and Christopher Baker concerning Amorim's purchase of RemoteMDx shares and the creation of a put agreement that gave Amorim the right to sell the RemoteMDx shares it purchased to VATAS at a specified price.

26.     The discussions between Windhorst and C.P. Baker & Co., Ltd. concerning Amorim's purchase of RemoteMDx shares and the creation of a put agreement that gave Amorim the right to sell the RemoteMDx shares it purchased to VATAS at a specified price.

14

27.     The discussions between Windhorst and C.P. Baker Securities, Inc. concerning Amorim's purchase of RemoteMDx shares and the creation of a put agreement that gave Amorim the right to sell the RemoteMDx shares it purchased to VATAS at a specified price.

28.     The discussions between Windhorst and C.P. Baker, LLC concerning Amorim's purchase of RemoteMDx shares and the creation of a put agreement that gave Amorim the right to sell the RemoteMDx shares it purchased to VATAS at a specified price.

29.     The discussions between VATAS and Christopher Baker concerning Amorim's purchase of RemoteMDx shares and the creation of a put agreement that gave Amorim the right to sell the RemoteMDx shares it purchased to VATAS at a specified price.

30.     The discussions between VATAS and C.P. Baker & Co., Ltd. concerning Amorim's purchase of RemoteMDx shares and the creation of a put agreement that gave Amorim the right to sell the RemoteMDx shares it purchased to VATAS at a specified price.

31.     The discussions between VATAS and C.P. Baker Securities, Inc. concerning Amorim's purchase of RemoteMDx shares and the creation of a put agreement that gave Amorim the right to sell the RemoteMDx shares it purchased to VATAS at a specified price.

32.     The discussions between VATAS and C.P. Baker, LLC concerning Amorim's purchase of RemoteMDx shares and the creation of a put agreement that gave Amorim the right to sell the RemoteMDx shares it purchased to VATAS at a specified price.

33.     The discussions between Windhorst and Christopher Baker concerning VATAS's financial situation in 2007-2009.

34.     The discussions between VATAS and C.P. Baker & Co., Ltd. concerning VATAS's financial situation in 2007-2009.

15

35.     The discussions between VATAS and C.P. Baker Securities, Inc. concerning VATAS's financial situation in 2007-2009.

36.     The discussions between VATAS and C.P. Baker, LLC concerning VATAS's financial situation in 2007-2009.

37.     The discussions between Windhorst and Christopher Baker concerning VATAS's ability to honor a put agreement with Amorim and other investors.

38.     The discussions between VATAS and C.P. Baker & Co., Ltd. concerning VATAS's ability to honor a put agreement with Amorim and other investors.

39.     The discussions between VATAS and C.P. Baker Securities, Inc. concerning VATAS's ability to honor a put agreement with Amorim and other investors.

40.     The discussions between VATAS and the C.P. Baker, LLC concerning VATAS's ability to honor a put agreement with Amorim and other investors.

41.     VATAS's financial situation from 2007 to the present.

42.     VATAS's ability to honor its put agreements with Amorim and other investors from 2007 to the present.

43.     Christopher Baker's knowledge that VATAS had entered into, or anticipated entering into, put agreements with investors other than Amorim.

44.     C.P. Baker & Co., Ltd.'s knowledge that VATAS had entered into, or anticipated entering into, put agreements with investors other than Amorim.

45.     C.P. Baker Securities, Inc.'s knowledge that VATAS had entered into, or anticipated entering into, put agreements with investors other than Amorim.

46.     C.P. Baker, LLC's knowledge that VATAS had entered into, or anticipated entering into, put agreements with investors other than Amorim.

47.     The circumstances surrounding the Berlin Public Prosecutor's Office's 1996 investigations concerning Lars Windhorst's alleged mishandling of funds during his employment at Windhorst Asia Pacific Holdings Ltd.

48.     The criminal complaints filed by Norddeutsche Landesbank Girozentrale against Lars Windhorst and VATAS in 2009 with the Berlin Public Prosecutor's Office and the resulting criminal charges, trial, and plea agreement.

49.     The 2004 bankruptcy proceedings of Windhorst AG, Windhorst Electronics GmbH, and Windhorst Capital Holding GmbH, Lars Windhorst's personal insolvency in 2007, and the bankruptcy proceedings of VATAS in 2009.

50.     C.P. Baker & Co., Ltd.'s knowledge of Subject Matter Numbers 47, 48 and 49 prior to January 25, 2008.

51.     C.P. Baker Securities, Inc.'s knowledge of Subject Matter Numbers 47, 48 and 49 prior to January 25, 2008.

52.     C.P. Baker, LLC's knowledge of Subject Matter Numbers 47, 48 and 49 prior to January 25, 2008.

53.     The circumstances surrounding the action filed by ALKI Partners L.P./ALKI Fund Ltd. against Lars Windhorst and VATAS in the United States District Court for the Southern District of New York titled *Alki Partners, L.P. and Alki Fund, Ltd. v. VATAS Holding GMBH, Lars Windhorst, Peter A. Ogrisek, Sapinda International Ltd., Robert B. Hersov, Credit Suisse Group AG, and Frederic Ruiz*, No. 09-Civ-8125(DAB) (February 19, 2010).

17

| | |
|---|---|
| *9. Identities and addresses of persons to be examined:* | Lars Windhorst<br>Sapinda UK Ltd<br>25 Park Lane,<br>London, England<br>WIK 1RA<br>Tel. +44 (0) 207 647 9876 |
| *10. Questions to be put to the persons to be examined or statement of the subject matter about which they are to be examined:* | Please see list of subject matters itemized above. |
| *11. Documents or other property to be inspected:* | Please see list of documents itemized above. |
| *12. Any requirement that the evidence be given on oath or affirmation and any specific form to be used:* | The witness should be examined under oath or affirmation, or in the alternative, should be instructed of the consequences for the giving of untruthful and false answers under the laws of England and Wales. |

*13. Special methods or procedures to be followed:*

The District Court respectfully requests, with respect to the oral testimony being sought:

(1) That the Senior Master appoint an English Examiner for the purpose of compelling oral testimony from the witnesses for use at trial;

(2) That Plaintiff's counsel, Steven Loble, a solicitor with the London firm of FINERS STEPHENS INNOCENT arrange for the nomination of an English barrister to act as Examiner in this matter. This Request is made pursuant to, and in conformity with Chapter I of the Hague Evidence Convention of March 18, 1970, the Evidence (Proceedings in Other Jurisdictions) Act 1975, the Rules of the District Court Order 70, and Rule 34, paragraphs 6 and 8 of the Civil Procedure Rules.

(3) That the parties' representatives or their designees, a court reporter and a videographer be permitted to be present during the examination; that the representatives or designees be permitted to examine and cross-examine the witnesses directly; and that a court reporter and a videographer be permitted to make a verbatim record of the proceedings.

In addition, the District Court requests, with respect to the documents being sought:

(1) That such orders be entered as English law permits directing that the documents described above be produced by and submitted to the Examiner or be made available for inspection and copying by Plaintiff's counsel, Steven Loble at a time and place to be determined by the High Court 7 days in advance of the oral examination;

(2) That the Senior Master enter an order that any documents produced in response to this Request shall be authenticated in accordance with the High Court's customary practice with any fees borne by the Plaintiff;

(3) That the documents so produced be submitted directly to Plaintiff's counsel, Steven Loble.

The District Court additionally requests that the confidentiality of any evidence produced as a result of this Request be maintained pursuant to the laws of the United Kingdom as well as to the Protective Order which was entered by the District Court on March 3, 2010.

The Confidentiality Order is designed to protect the producing entities from unauthorized use and/or disclosure of trade secrets and other proprietary information. The Confidentiality Order protects the producing entities from unauthorized use and/or disclosure of trade secrets and other proprietary information. The Confidentiality Order provides that "[e]ither party or any non-party may designate as 'Confidential' any information, deposition testimony, or document produced or provided in this litigation." ¶1, *Confidentiality Order*.

Confidential material may not be disclosed to any person except counsel for all parties in the Action, the parties in the Action, the Court in the Action; with respect to documents only, deponents or witnesses; and other third parties, including experts, consultants, accountants, and fact witnesses, who are bound by the terms of the Confidentiality Order. *Id.* at ¶2.

Information designated as "Confidential" must be used "solely for purposes of the Action, including in prosecuting, defending or settling the Action, in testimony and exhibits at the trial and appeal of the Action, or in connection with motions, depositions, or witness preparation in the Action." *Id.* at ¶3. If any party has objections to the designation of any

document/information as "Confidential," it may request in writing the removal of the "Confidential" designation. Until the Court rules on whether the materials in questions are properly "Confidential," all documents and information designated as "Confidential." *Id.* at ¶7.

Documents and information that are already public knowledge or become public knowledge are not be subject to the restrictions and obligations of the Confidentiality Order. *Id.* at ¶12. The Confidentiality Order also applies to any "'Confidential'" information or documents required to be produced by subpoena, court order, or otherwise by law." *Id.* at ¶14. Anyone may apply to the Court for relief from the Confidentiality Order, as well as apply to the Court for "further or additional protective orders." *Id.* at ¶16.

In any event, within thirty (30) days after the conclusion of this action, "all 'Confidential' material and all copies thereof must be returned to the producing person, or counsel of record may certify in writing that such material has been destroyed, except that counsel for each party may retain one copy of all pleadings or other materials filed with the Court and one copy of all transcripts. *Id.* at ¶9.

| | |
|---|---|
| ***14. Request for notification of the times and place for the execution of the Request and identity of the person to be notified:*** | It is requested that testimony be taken at such place, date or time as ordered by the Senior Master and/or as otherwise scheduled by the representatives of the Plaintiff and/or as otherwise agreed to by the witnesses and the respective representatives of the Parties.<br><br>***Notice thereof should be made to Plaintiff's UK designee:***<br><br>Steven Loble, Esq.<br>FINERS STEPHENS INNOCENT<br>179 Great Portland Street<br>London W1W 5LS |

UNITED KINGDOM
Tel.: +44 (0) 20 7344 5532
Fax: +44 (0 )20 7580 7069
Email: steven.loble@fsilaw.com

**15. Request for attendance or participation of judicial personnel of the requesting authority at the execution of the Letter of Request:**

None.

**16. Specification of privilege or duty to refuse to give evidence under the laws of the State of origin:**

Under the laws of the United States, a party has a privilege to refuse to give evidence if the evidence discloses a confidential communication between that party and an attorney for that party that was made for the purpose of obtaining legal advice.
Parties also enjoy limited privileges on other grounds not relevant here such as communications between physician and patient, psychotherapist and patient, husband and wife, or clergy and penitent.
US law also recognizes a privilege against criminal self-incrimination.

Outside the strict area of privilege, certain limited immunities are available that may place restrictions on the giving of evidence, such as the limited protection of documents created as the work product of attorneys during or in anticipation of litigation.

*17. The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by:*

Plaintiff, Amorim Holding Financeira, S.G.P.S., S.A.

*c/o Plaintiff's legal representative in the U.S.:*
Anthony S. Fiotto, Esq.
Damian W. Wilmot, Esq.
Karen G. Hong, Esq.
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
USA
Tel.: +1 (617) 570-1000
Fax: +1 (617) 523-1231
Email: AFiotto@goodwinprocter.com
        DWilmot@goodwinprocter.com
        KHong@goodwinprocter.com

*18. Date of Request*

~~January~~ February 7 , 2011

*19. Signature and seal of the Requesting Authority:*

The Honorable Leo T. Sorokin
United States Magistrate Judge
United States District Court for the
District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, Massachusetts 02210
USA

[Seal of the Clerk of the Court:]

*Annex A:* Key Documents Supporting this Request



