UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMORIM HOLDING FINANCEIRA,<br>S.G.P.S., S.A.<br><br>       Plaintiff,<br><br>v.<br><br>C. P. BAKER & CO., LTD. and<br>CHRISTOPHER P. BAKER,<br><br>       Defendants. | Civil Action No. 09-10641-DPW |

## DEFENDANTS' SECOND MOTION TO COMPEL

Pursuant to Federal Rules of Civil Procedure 26, 33, 34, and 37, Defendants C.P. Baker & Co. Ltd. and Christopher Baker respectfully move this Court to compel discovery and for an award of reasonable attorneys' fees, as explained below.

1. **Background.** The parties were co-investors in a series of companies. Americo Amorim of Portugal, the president of Plaintiff Amorim Holding Financeira, S.G.P.S., S.A. ("AHF"), is the most successful cork-tree farmer of all time, with business and investments around the globe. The parties' relationship began in 2004, when Mr. Amorim aggressively courted Defendant Christopher Baker ("Baker"), head of C.P. Baker & Co., Ltd. ("CPB"), to provide debtor-in-possession financing to a company in which Mr. Amorim had already lost millions of dollars. Amorim and his array of corporations and trusts, only one of which is AHF, then invested along with Defendants in other securities. One was the Anasazi III Offshore Fund, ("Anasazi") which Baker managed, and others were in start-up companies including My Sky Communications, Inc. ("My Sky") (which developed weather satellite software), Chime Entertainment, LLC ("Chime") (a producer of pop music), One IP Voice, Inc. ("One IP Voice,"

also known as "Farmstead") (a voice-over-internet protocol telephony company),  Z-Force

Partners, LLC ("Z-Force") (producer of a children's action cartoon), On-Card, Inc. ("On-Card")

(a shopping company), American Entertainment Holding Company, LLC ("AEHC") (an owner

of movie-script intellectual property, in which actor and producer Michael Douglas is a

principal).  These companies are referred to herein as the "Portfolio Companies."  There was a

common investment in a publicly traded company, Remote MDx, Inc. ("Remote MDx"), which

makes security bracelets for prisons.  On the whole, the investments have not prospered.

Amorim throws the blame on Baker, and the investments on which he has lost money are

bundled and sold as this lawsuit.

AHF alleges a lack of investment sophistication and attendant "total reliance on Baker",

who allegedly had "complete discretion in choosing investments for Amorim."  *See, e.g.,*

Complaint at ¶ 6 (alleging AHF's "*complete* reliance on Baker's sophistication") (emphasis

added), ¶ 22 (referring to AHF's "*total* reliance on Baker") (emphasis added) ¶57 (alleging

Defendant's "complete investment discretion").[1]  This motion seeks documents that AHF has

refused to produce and answers to interrogatories that it has completely rebuffed.  The discovery

will reveal that many of AHF's allegations are false and that some are in bad faith.

**2. AHF and the Rest of the Amorim Group.**  Mr. Amorim is president of AHF, *see*

Complaint at ¶ 15, which is part of the Amorim Group. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

accompanying Affidavit of Daniel J. Dwyer ("Dwyer Aff."), at p. AHS 002223; *see also*

30(b)(6) Deposition of Filipe Sobral ("Sobral 30(b)(6) Depo."), Exhibit 2 to Dwyer Aff., at p. 28

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[1] The Complaint refers to the Plaintiff as "Amorim."  It is here called "AHF" in order to distinguish it from the many
other entities in the Amorim Group corporate organizational chart that begin with the word "Amorim."

Group's consolidated financial statements.) 

Sobral 30(b)(6) Depo. at p. 34; *see also* Annual Report at AHS 002296 ▮▮▮▮▮; AHF

Suppl. Resp. to CPB Interrogatories, Exhibit 3 to Dwyer Aff., at Resp. No. 1 (▮▮▮▮▮[2]

    Amorim Global Investors (AGI), founded in 2008, is the Amorim Group's private equity

fund. Mr. Amorim is its chairman. *See id.* at Resp. No. 2. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮[3] *See id.* at

Resp. No. 1 (chairman); *see also* Baker First Set of Interrogatories at Exhibit 4 to Dwyer Aff. at

Tab A (CEO & chairman).   AGI's debut was accompanied by Amorim Group advertisements

which are here called "*Why AGI.*"  ("*Why AGI*" as used here refers to all documents included at

Tab B of Dwyer Aff. Ex. 4., and not just the page that actually says "Why AGI.")  The

advertising includes a message from Mr. Amorim, who says:

> In addition to its core cork business, *the Amorim Group has successfully expanded into several other investment areas including real estate, financial services, tourism, telecommunications, energy and infrastructure, and has continuously achieved remarkable results*.... Under this framework, Amorim Global Investors emerges as the Group's most recent enterprise, incorporated to explore new investment opportunities in various sectors, in Portugal and abroad.

*See* Dwyer Aff. Ex. 4 at Tab A (italics added).  The remainder of the *Why AGI* literature abounds

with statements touting *the Amorim Group's* (not AGI's) "landmark achievements and

investment track record with vast experience across a number of industries in several

geographical areas[,]" its "extensive know-how, foresight, and renowned ability to invest

---

[2] Mr. Amorim's wife owns 26% of the Group, and three daughters own the remaining shares in equal amounts. *See* Annual Report at AHS 002296 (representing individual ownership interests of 41 million total shares).

[3] AIP, in turn, is wholly owned by an entity called Interfamilias II. *See id.* at Resp. No. 5. Mr. Amorim personally owns 43.97% of Interfamilias II, and AHF owns another 5.58% of it. *Id.* The practical relationship between the Amorim Goup and Interfamilias II is that, "the Group acts through its associate company Interfamilia (sic) II." *See* Annual Report at p. AHS 002251, *Notes to Consolidated Financial Statements, Introductory Note.*

acquired over decades[,]" and the like.  These representations are quoted more fully in

Defendants' interrogatories, recited below.  *See infra* **at n. 18.**

### 2. Intermingling of Officers, Directors and Employees Among the Amorim Group and its Constituent Entities.

Mr. Amorim is an active boss who gives orders across the Group's organizational chart.



*See* Deposition of Americo Amorim ("Mr. Amorim Depo."), Exhibit 5 to Dwyer Aff., at p. 18.

Annual Report at p. AHS 002218.

Deposition of Sergio Oliveira "(Oliveira Depo."), Exhibit 7 to Dwyer Aff., at p. 8.  Joao Leitao,

*See* Leitao e-mail dated January 25.

2007, at p. CPB 00403, Exhibit 8 to Dwyer Aff.

*See* Deposition of Marta Amorim ("Marta Amorim Depo.)

Exhibit 9 to Dwyer Aff., at p.18.

Group), *see* Annual Report at AHS002251    *see* Option Contract included in Exhibit 10 to

Dwyer Aff., at p. CPB 006068, and    *see* Bloomberg Businessweek Profile of Hugo

Domingos, included in Dwyer Aff. <u>Ex. 27</u>.



<u>khibit 12</u> to Dwyer Aff.

eposition of Paula Amorim ("Paula Amorim Depo.")

<u>Exhibit 13</u> to Dwyer Aff., at p. 7.

*See* <u>Exhibit 10</u> to Dwyer Aff. at p. CPB 006068. Alleged losses on this one investment are about sixty percent of AHF's damages.

## ARGUMENT

1. **Documents Responsive to Initial Document Requests.**

    *A.*    ***The Controlling Law.*** This Court is familiar with the standards of Rules 26, 33 and 34 of the Federal Rules of Civil Procedure. Governing cases are cited below where germane.

    *B.*    ***Damages Evidence, Financial Statements.*** Defendants' original document requests, in October 2009, included a request for all documents supporting AHF's alleged damages. *See* AHF Resp. to CPB's First Doc. Req., <u>Exhibit 14</u> to Dwyer Aff., at Req. No. 31. The first kind of responsive documents should have been AHF's financial statements. These would reflect its valuation of the investments at issue, which (except for Remote MDx) are small private companies with no established market value. AHF agreed to produce damages evidence, *see id.,* but did not produce any internal financial statements. However, AHF's 30(b)(6)

deponent, Filipe Sobral, testified tha█ ████████████████████████████
██████████████████████ *See* Sobral 30(b)(6) Depo., <u>Exhibit 2</u> to Dwyer Aff., at pp. 29-31.
██████████████████████████████████████████Mr. Sobral, however, now

declines to "dig that far down." *See* Rule 37 Letter of Daniel J. Dwyer, Esq., to Damian Wilmot,

Esq., dated July 30, 2011, <u>Exhibit 15</u> to Dwyer Aff., at ¶ 2.████████████████████
████████

AHF contends██████████████████████████████████████████████
█████████████████████████████████████████████████████████████
██████████████████████ *See* Letter of to Damian Wilmot, Esq., to Daniel J.

Dwyer, Esq., dated August 9, 2011, <u>Exhibit 16</u> to Dwyer Aff., at p. 4, Item No. 2.  But

Defendants are entitled to test this assertion and will do so.[5]  *AHF cannot prosecute a claim for*

*allegedly worthless privately-held securities without producing its own valuations of the*

*securities.*  If ██████████████████ o not record valuations individually for each asset,

it must produce the documents that do, contemporaneous with the generation of every balance

sheet.  Whatever went to Amorim's auditor relating to the investments must also be produced.[6]

AHF's internal financial statements have another critical purpose: they will confirm that



---

[6] For the same reason, AHF must also produce copies of all bank statements reflecting investments by AHF (or any of its affiliates) in Anasazi or the Portfolio Companies.  AHF seeks to prove its case with financial records of others, going to far as to use Mr. and Mrs. Baker's personal bank statements.  Reciprocity is in order.

AHF was an investor in *only one* of the companies at issue in this case (My Sky).  The original

investor in Anasazi, AEHC, Z-Force, Chime, and On-Card was a Gibraltar corporation called

Morris Holdings, Ltd. ("Morris Holdings"), ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████ *See, e.g.*, Deposition of Andrew Goodman, ("Goodman Depo.") <u>Exhibit 17</u> to Dwyer

Aff., at pp. 37-38, 90-91. ████████████████████████████████

████████████████████████.[7]  AHF alleges some kind of affiliate-based ownership

dating back to Morris Holdings' investments in 2004 and 2005, but Defendants have adamantly

contested this since their motion to dismiss.  AHF's financial statements will provide an

undisputed record of AHF's *non*-ownership in 2004, 2005, 2006 and part of 2007.  Accordingly

these documents are critical.  That is why AHF refuses to produce them.

    **C.**    ***Documents Concerning the Remote MDx/Vatas Transaction.***  Sixty percent of

AHF's damages claim concerns Remote MDx, a publicly-traded company.  In January 2008,

AHF bought $18.5 million worth of Remote MDx shares from a German bank, Nord Deutche

Landes Bank ("Nord L.B.")  *See* Sobral 30(b)(6) Depo. at p. 207 (regarding Nord L.B.) and

generally at pp. 204-66 (regarding Remote MDx/Vatas transaction).  In connection with the

purchase, AHF entered into a "put" contract with a German private equity firm called Vatas

Holding GMBH ("Vatas").  *See id.; see also* <u>Ex. 10</u> to Dwyer Aff. (put contract).  The put was to



generate a $3 million profit for AHF in six months. *See* Complaint at ¶ 36. ███████████

████████████████████████████████ *See* Sobral 30(b)(6) Depo. at pp.

256-64. To make a long story short, AHF sought to exercise the put but Vatas did not pay.

Vatas petitioned for bankruptcy protection in Germany.

That is background. Defendants requested "All documents concerning Remote MDx,

Inc. ("Remote MDx"), including without limitation all documents concerning your diligence,

investigation or analysis respecting any investment in Remote MDx." *See* Ex. 14 to Dwyer Aff.

at Req. No. 21. Defendants also requested all documents concerning Vatas, *id.* at Request No.

22, and concerning Lars Windhorst, Vatas's managing director, *id.* at Req. No. 23. In Rule 37

conferencing, Defendants insisted on, among other things, the purchase contract (not the put)

with Nord L.B. and evidence of payment for the shares. AHF's lawyers refused to produce these

centrally important documents on the ground Defendants did not request them. *See* Dwyer

Letter, Ex. 15 to Dwyer Aff., at ¶15; *see also* Wilmot Letter, Ex. 16 to Dwyer Aff., at p. 4, Item

No. 15. ("...you did not properly request these documents prior to the end of the discovery

period.")

If the purchase contract for $18.5 million in Remote MDx shares and some evidence that

AHF paid the $18.5 million are not "'documents concerning Remote MDx," there is no point in

having civil discovery. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ *See* Translation

████████████ dated August 25, 2008, Exhibit 19 to Dwyer Aff., at AHS 0004684. AHF

must produce the Nord L.B. purchase contract, any documents reflecting████████████████



Similarly, ████████████████████████████████████ ██████. *See* Translation of ████████████ated November 21, 2008, included in <u>Ex. 19</u> to Dwyer Aff., at AHS 0004638. *Id.* ████████████████████████████ ██████████████████████concerning Vatas (Req. No. 22), or concerning Windhorst (Req. No. 23). ████████████████████████ a█████████████████████████████████████████████ A███████████████████████████████████████████████

*See* Dwyer Letter, <u>Ex. 15</u> to Dwyer Aff., ¶15. These documents will show that AHF knew what it was buying, apart from whether the put was good. AHF has refused to produce these, too, on the incredible ground that they have not been requested. *See* Wilmot Letter, <u>Ex. 16</u> to Dwyer Aff., at p. 4.

### D. Offering and Subscription Documents, Mainly as Attachments to E-mails.

Shares in Anasazi and the Portfolio Companies were issued pursuant to offering or private placement memoranda. The offering memos are thick with disclosures relating to the investments, emphasizing that investors who cannot afford to lose everything in risky start-ups should go elsewhere. Many offering memos were e-mailed, some were sent in paper form. There were multiple iterations of several offering memos.███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ a███████████████████████

Defendants simply want to discover what offering memos went with what correspondence, and ask for the e-mails to be produced *with* accompanying attachments.[8] AHF refuses. First, it contends that, ███████████████████████████████████████████████████████. *See* Wilmot Letter, Ex. 16 to Dwyer Aff., at p. 5, at Item No. 14. That is impossible. ███████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ast ████████████████████████████████████████████████ion of the correspondence and attachments should be the subject of a stipulation, let alone discovery, and Defendants cannot even obtain it as discovery. AHF will not comply because it is dodging the record of the risks that it willingly took on or ignored.

2. **Documents Responsive to April 2011 Document Requests.**

A. *Amorim Alternative Investments.* Defendants requested "[a]ll documents concerning

---

[8] Defendants have, pursuant to Rule 37, specified the following offering memos, together with cover correspondence:
- Anasazi: ████████████████████████████████████to ████████████████████████placement memorandum, subscription document, and ███████████████████
- Z-Force: ████████████████████████████████████████ F██████████████████████████████████████████.
- My Sky: ████████████████████████████████████████g the My S██████████████████████████████████ to Dwyer Aff.
- AFHC: T███████████████████████████████gned by A████████████████████████.
- One IP Voice: A██████████████████████████████████ c██████████████████████████████
- Chime: ████████████████████████████████████on██ w████████████████████████████

Amorim Alternative Investments." *See* AHF Resp. to CPB Second Doc. Req., <u>Exhibit 24</u> to

Dwyer Aff., at Req. No. 1.  AHF objects that AAI is irrelevant. ▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐ *em.  See* Sobral

30(b)(6) Depo. at p. 22.[9]  This alone defeats the objection.  AAI is even more relevant because



Such

cursory descriptions of these funds as are publicly available[10] make clear tha▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐' *see* Complaint at ¶

36,▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐  *See*

AHF's Resp. to CPB First Set of Interrogatories, <u>Exhibit 28</u> to Dwyer Aff., at Suppl. Resp. No.

---

[9] ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐ *See* Anasazi
Partners III Offshore Application Form, <u>Exhibit 25</u> to Dwyer Aff., at p. 1.

[10] ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐ (1) six funds from the Spinnaker Capital Group, a private equity firm
specializing in emerging markets, *see* http://spinnakercapital.com/ introduction; (2) two private equity funds of the
well-known Carlyle Group; and (3) shares in Magnum Capital, L.P., a Portuguese private equity firm.  The
Spinnaker website describes the firm's "principal business" is to "invest in *all classes* of sovereign and corporate
securities and related products, across all regions of the emerging markets." (Italics added.)  According to
Bloomberg Businessweek, one of the funds, Carlyle Partners V, L.P.:

> ...specializes in *privatizations, leveraged buyout transactions, and strategic minority investments.* The fund
> seeks to invest in aerospace, defense, healthcare, consumer and industrial, information technology,
> telecommunications, and media sectors. *It seeks to invest in companies based in the North America
> including United States,* Canada, and Europe.

*See* http://investing.businessweek.com/businessweek/research/stocks/private/snapshot.asp? privcapId=31304422
(italics added).  The other Carlyle fund Riverstone/Carlyle Global Energy and Power Fund IV, L.P, according to the
Carlyle Group's website:

> ...provides private equity capital for management buyouts, leveraged build ups, growth capital
> opportunities and strategic joint ventures in the energy and power industry.

*See* http://www.carlyle.com/Fund/Buyout/Global%20Energy%20Power/item8329.html#.

2. ███████████████████████████████████████████████████████

██████ This was AHF's business too.[11]

████████████████████████████████████████████████████████████

██████ *See* Ex. 26 to Dwyer Aff. The document says little of substance. The truly probative,

responsive documents would include, as to *all* of the securiti██████████████████d

█████████████████████ offering memoranda, risk disclosures, subscription agreements and

other contracts, account statements, updates from fund managers, e-mail, meeting minutes

concerning the investments, and documents reflecting the reliance – or lack of reliance – on

outside "investment guide[s]." *See* Complaint at ¶ 3 (describing Baker as an investment guide.).

*These must all be produced.* Defendants specifically insisted on their production. *See* Dwyer

Letter, Ex. 15 to Dwyer Aff., at ¶4 ("Please include, without limitation, all investment contracts,

PPMs, risk disclosures…"); *see also id.* at ¶¶ 3-6 (regarding AAI). Defendants cannot

adequately contest AHF's alleged *lack* of investment sophistication and *fear* of risk if they

cannot impeach AHF with the documents that will establish its investment sophistication and

*comfort* with risk.

AHF alternatively contends tha███████████████████████████████████

██████████████████████████ 1. This cannot be correct██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[11] In order to suggest an aversion to investment risk, AHF's original interrogatory answers identified only a more conservative assortment of investments (repeated in Response No. 5 to Dwyer Aff. Ex. 3) that it claims to have owned pre-Anasazi. But the relevance of AHF's risk tolerance is not limited to the investments that it made *pre-*Anasazi. AHF repeatedly purports to state a holder's claim as well as a buyer's claim. *See* Complaint at ¶¶ 49, 52. Thus, its risk tolerance during the entire time it held the shares in Anasazi and the Portfolio Companies is a live issue. Indeed AHF conceded the point in deposition. *See* Mr. Amorim Depo. at pp. 12-13.

family. Under the controlling cases, legal ownership of documents matters little. Motions to

compel turn on the "practical ability" to obtain documents, which ▇▇ has. *See infra* at

pp. 14-17 (extended discussion of duty to produce documents where, among other things, related

corporations intermingle personnel and facilities).[12]

**B.**   *Amorim Global Investors.*   In February 2008, the Amorim Group launched its

own private equity fund, Amorim Global Investors (AGI). The Amorim Group's marketing

literature emphasized that *the Group*, not the fledgling AGI, possessed an investment

sophistication, proven by years of great returns, that made AGI a good bet for private-equity

investors. *See* Dwyer Aff. Ex. 4 at Tab B. Clearly, the Amorims are not the band of investment

know-nothings that they would like a Massachusetts jury to believe. Defendants requested "[a]ll

documents concerning Amorim Global Investors." *See* Dwyer Aff. Ex. 24, at Resp. No. 2.

Defendants are after two types of responsive documents. The first are those substantiating the

boasts of the Amorim Group's investment prowess contained in the *Why AGI* literature. Those

should be in the Group's possession. The second type is day-to-day AGI business documents

sufficient to identify: AGI's investment objectives and risk tolerances; any investment that AGI

made in any company in which AHF (or its alleged affiliates) invested along with in with

Defendants; and what AGI owns now.

---

[12] AAI documents reflecting Mr. Amorim's investment sophistication are also discoverable. ▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇ nothing about private equity when it comes to his AHF investments. His investment skill and knowledge cannot be artificially segregated depending on who he is investing for on a given day. AAI records reflecting on his investment experience and knowledge must be produced, because they will impeach the allegation and sworn statement that AHF was totally dependent on Baker. Mr. Amorim is hoping that a gullible jury will accept his almost comic self-portrayal as an elderly cork-tree farmer afraid to seek anything higher than a T-bill rate of return. It would be a miscarriage of justice for this Court to permit such deception ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



The Plaintiff objects, stating that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ No. 2." *See* Dwyer Aff. Ex. 24, AHF Resp. to CPB Second

Doc. Req. at Resp. No. 2.  That objection was not factual.[13]  After several Rule 37 conferences,

AHF revealed (by producing them) that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[14]  Furthermore ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This is quite a lot of intermingling (and

privilege-waiving), given ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[13] Nor is it logical.  The conclusion does not follow.



[14] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Because AHF is being asked for the Group's and AGI's documents, some governing law is in order. Cases construing the familiar "possession, custody or control" language of Rule 34 emphasize its reach. Legal ownership of documents is not determinative, *see* Moore's Federal Practice sec. 34.14[2][b], p. 34-73, and "[t]he term 'control' is broadly construed." *Id.* at p. 34-75. Where documents are sought from a party that may belong to another entity, the party's non-ownership of the requested documents does not excuse production. Rather, *"the better view is that the concept of control extends to situations in which the party has the practical ability to obtain materials in the possession of another...." See id.* at p. 34-79 (italics added). Such practical ability may arise from many factors, all of which are satisfied by the record facts of this case.

     *(i)*    **Intermingling of Employees, Officers and Directors**. A party will be required to produce the documents of a related company where there exists an "exchange or intermingling of officers, directors or employees of...two corporations," *see Uniden America Corp. v. Ericsson*, 181 F.R.D. 302, 306 (M.D.N.C. 1998), or a "deeply intertwined corporate structure," *see Afros S.P.A.v. Krauss-Maffei Corp.*, 113 F.R.D. 127 at 130 (D. Del. 1986).[15] ███████████ ███████████████████████████████████████ ██████████████up. Space constraints do not permit repetition of the facts set forth at pages 4-5 and n. 14, *supra,* ████████████████████ ████████████████████████████████ ████████████████████

[15] Moreover, the existence of a corporate "parent once removed," here, █████████ ███ es not insulate documents from discovery where as here, the existence of the intervening corporate owner is of no practical consequence. *Id.; see also supra* n. 3 ("████████████████████████████████" *See also, e.g., In re Uranium Antitrust Litigation, Westinghouse Elec. Corp. v. Rio Algom Ltd., et al.*, 480 F. Supp. 1138, 1152 (N.D. Ill. 1979). ("[A]n interlocking structure of corporate directors, officers, and administrative personnel" at one company, who "at all pertinent times acted in behalf of" a corporate affiliate," will not be heard to disavow knowledge of one another's activities or control of one another's documents.)

█████████████████████████████████ Even if "documents have found their

way into [a non-party's] files…. The formalities separating the two corporations cannot be used

as a screen to disguise the coordinated nature of their…enterprise." *See In re Uranium Antitrust*

*Litigation, Westinghouse Elec. Corp. v. Rio Algom Ltd., et al.*, 480 F. Supp. 1138, 1153 (N.D. Ill.

1979).

     *(ii)*    ***The Easy Availability of Documents.***  Companies that can "easily obtain

[documents] when it [is] in their interests to do so," will not be heard to cry lack of access during

discovery. *See M.L.C. Inc. v. North American Philips Corp.*, 109 F.R.D. 134, 138 (S.D.N.Y

1986).██████████████████████████████████████████████████

████████████████████████████████s.[16] Clearly, for *offensive* litigation

purposes, AHF has wide access to documents regarding all investments. If it did not, it could not

have filed its complaint. It therefore cannot, for *defensive purposes*, cry "no access."

████████████████████████████████████████████████████s

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████s

██████████. *See Uniden*, 181 F.R.D. at 307. Only a tiny fraction of AHF's production is

actually comprised of AHF documents as such.

     *(iii)*    ***Financial Interest in the Litigation Outcome.***  A parent that financially benefits

from a subsidiary's litigation must produce documents in that litigation. So too with "affiliates."

---

[16] Five investments (Chime, AEHC, On-Card, Z-Force and Anasazi) were originally made by Morris Holdings. One of those five (Anasazi) is now owned by AAI. Morris Holdings redeemed its shares in two companies (Chime and Z-Force) for its full purchase price in 2007. AHF invested a like amount at that time. Two other investments (AEHC and On-Card) still seem to be owned by Morris Holdings. The last investment (One IP Voice) was by Sotomar, also part of the Group.

A party suing to recover for investment losses *by* its "affiliates," *see* Complaint at ¶ 17, must produce relevant information *about* its affiliates.

     **(iv)**    ***Parent's Role in Subsidiary's Transaction at Issue.***  In *Camden Iron & Metal, Inc. v. Marubeni America Corp.*, 138 F.R.D. 438, 443, (D.N.J. 1991), a subsidiary's control of documents was established by evidence of the parent's "significant role in the transaction through its continued participation in the negotiation process," and "the presence of [the parent's] presence on the inspection team during inspections in the United States."  Such facts are the story of the captioned action. ████████████████████████████████████ ████████████████████████████ *See supra*, pp. 4-5. ████████ ████████████████████████████████████████████████████ ████████████████████████████████ *See* e-████████████████████████████████████hibit 11 to Dwyer Aff. ██████████████████████████████████ n. 14. Accordingly, AHF must be held to have access to documents of Amorim Holding II (*i.e.*, "the mother company") and of AGI.

     **C.**    ***Documents Concerning Robert Beuret.***  Robert Beuret was a broker at C.P. Baker Securities, Inc.  H██████████████████████████████████████████████ ██████████████. *See* Mr. Amorim Depo. at p. 27 & 32-33████████████████████ ████████████████████████████and in 2006, he recommended the investment in One IP Voice.  S*ee* Complaint at ¶ 33.  One IP Voice went bankrupt by the end of 2006, at which point Mr. Amorim ████████████████████████████, *See* Amorim Depo. at pp. 54-56.  Beuret left C.P. Baker Securities, Inc. in 2007, but continued to facilitate stock purchases for Baker-related companies that Mr. Amorim wanted to buy more of.

Documents concerning ████████████████████████████████████████ AHF the hardest ████████████████████████ ase will seriously undermine AHF's allegations that it believed CPB's actions were fraudulent, or even negligent.  If anyone deceived Amorim, it was Beuret; if he did not, no one did.  (No one did.)



dated ████████████████████████ Ex. 19 to Dwyer Aff., at AHS 004636-█

2008 Meeting Minutes, Ex. 19 to Dwyer Aff., at AHS004634-35.  ████████████

di█████████████████████████████████s.  *Id.*  Accordingly, *all documents* in the possession of AHF *or its lawyers*, reflecting ████████████████████████ t█████████████████████████████None of the communications produced thus far relate to any of this,[17] █████████████████████████

███████████████████████████████████████████████

██████████████████████████████████ *Id.*  This is blockbuster impeachment evidence against a key informant in a mean piece of litigation.  An order compelling production of *all documents regarding Robert Beuret* is necessary to dislodge all documents post-dating Beuret's 2007 departure, not just those of marginal value so far produced.

---

[17] Prior to the filing of this motion, AHF relented somewhat and produced 552 documents concerning Bueret, mainly about Healthfusion, Inc., am AHF-CPB co-investment that AHF has not included in this suit.  These pages refer to others that are missing.

3.      **Interrogatories.**  Five interrogatories, served in April 2011, are at issue.  They

are essentially all the same; each seeks the factual basis for a given statement contained in the

*Why AGI* literature regarding the Amorim Group's "landmark achievements" as an investor, its

"renowned ability to invest acquired over decades," and so forth. ▐███████████████

████████████████▌s.  Its objections and Defendants' responses thereto are:

---

[18] **INTERROGATORY NO. 5**

With reference to the document attached hereto at Tab B [pages from website], explain as well as you are able the factual basis for the statement that: "Amorim Group is renowned for its landmark achievements and investment track record with vast experience across a number of industries in several geographical areas.  AGI intends to capitalize on the Group's outstanding track record and leadership." *See* Tab B at "Introduction." *Include in your answer the names of the persons whose individual track record and leadership collectively comprise "the Group's outstanding track record and leadership."*

**INTERROGATORY NO. 6**

With reference to the document attached hereto at Tab B, explain as well as you are able the factual basis for the statement that: "The global economic development is marked by business cycles and the *Amorim Group has always shown a great deal of ability to identify opportune moments to invest, and in turn, benefit from the asymmetries generated by the various economic cycles.* As previously occurred, good investment opportunities will arise from the current cycle." *See* Tab B at "Introduction."

**INTERROGATORY NO. 7**

With reference to the document attached hereto at Tab B, explain as well as you are able the factual basis for the statement that: "AGI draws on Amorim Group's *extensive know-how, foresight, and renowned ability to invest acquired over decades." See* Tab B at "Introduction."

**INTERROGATORY NO. 8**

With reference to the document attached hereto at Tab B, explain as well as you are able the factual basis for the statement that: "AGI is able to build on *the expertise, foresight and global network of the Amorim Group,* which has a *proven ability to identify good investment opportunities in adverse conditions and economic periods."* *See* Tab B at "Why AGI."

**INTERROGATORY NO. 9**

With reference to the document attached hereto at Tab B, explain as well as you are able the factual basis for the statement that: "AGI's differentiation stems from not having a rigid exit strategy, commonly seen in other private equity funds, whilst aiming to establish real exit options from day one." *See* Tab B at "Why AGI."

**INTERROGATORY NO. 10**

*(1)* ████████████████████████████████████████████

AHF ███████████████████████████████████████████████

The controlling cases liberally define what an organizational party is deemed to know, and make

avoiding interrogatories harder than avoiding document requests. "In the case of a (sic)

organizational party to an action, the duty to provide all information available refers to any

information imputed to the organizational party itself, *including information possessed by*

*officers, employee, and former employees of the party, as well as the party's counsel.* For

example, a corporate officer or agent answering interrogatories for a corporation *must secure all*

*information within the personal knowledge of anyone in the corporation.*" *See Moore's*, sec.

33.102[2] (italics added); *see also General Dynamics Corp. V. Selb Mfg.*, 481 F.2d 1204, 1210

(8th Cir. 1973).[19]  *See also Martin v. Brown*, 151 F.R.D. 580, 593-594 (W.D. Pa. 1993).

Under this standard██████████████████████████████████

president of AHF ████████████████████████████████████

"████████████████████████████████████████████████████

across a number of industries in several geographical areas" (Int. No. 5████████████████

the persons who have built "the Group's outstanding track record and leadership" (Int. No. 5),

████████ns of the Amorim Group's "great deal of ability to identify opportune moments to

invest and… benefit from the asymmetries generated by the various economic cycles," (Int. No.

6). ██████████████uired its "extensive know-how, foresight, and renowned ability

to invest *acquired over decades*," (Int. No. 7) a████████ed its "proven ability to identify

---

With reference to the document attached hereto at <u>Tab B</u>, explain as well as you are able the factual basis for the statement that: "AGI possesses the capacity and the resources to invest in various sectors and geographical areas with a proven high growth potential." *See* <u>Tab B</u> at "Why AGI."

[19] Otherwise the law concerning interrogatories substantially overlaps with that concerning document production. *See Moore's*, sec. 33.102[2] ("These factors [set forth in Rule 34] appear well-suited to a determination with respect to interrogatories directed toward a subsidiary.")

good investment opportunities in adverse conditions and economic periods." (Int. No. 8).  And

Mr. Amorim is only one person ███████████████████████████████████████

███████████████████████████████████████████ ts.  Retrieval of

the requested information is as easy as chatting with family members or co-workers ████████

████████ r looking in file cabinets or computer monitors there. ██████████████

    *(2)* ██████████████████████████████████████████████

██████████████████████████████████████████████

████████, because *the interrogatories are not about the investments at issue.*  They are about the

Group's enviable expertise developed over a *very long period of time.* ████████████████

████████████████████████████████.

    *(3)* █████████████████████████████████████.  This

objection, like the previous one, lacks merit because ███████████████████████████

██████████████████████████████████████ nt.

    *(4)* ██████████████████████████████ Not so.  "Speculation" is

a buzz word employed to escape giving answers.  Defendants do not want speculation ███████

███████████████████████████████

    Finally, even in its Rule 37 correspondence, ████████████████████████

█████████████████████████████████████████████████ t

█████████████████████████████████████████████████ t

███████████████████████ Defendants have spent a week in Portugal deposing

people involved with the transactions at issue.  They should not need repeated trips there, or be

put to multiple Hague Treaty procedures, for compliance with straightforward production

requests that have been cynically evaded.

**WHEREFORE,** Defendants C.P. Baker & Co., Ltd. and Christopher P. Baker

respectfully request an order **ALLOWING** this motion and **AWARDING** reasonable attorneys'

fees incurred in its preparation.  A form of proposed Order is filed herewith.

> C. P. BAKER & CO., LTD. and
> CHRISTOPHER P. BAKER
>
> By their attorney,
>
>
> /s/ Daniel J. Dwyer
> Daniel J. Dwyer (BBO #567026)
> MURPHY & KING, P.C.
> One Beacon Street
> Boston, MA  02108
> (617) 423-0400
> (617) 423-0498 Fax
> djd@murphyking.com

Dated:  September 28, 2011

### RULE 37(a)(1) CERTIFICATION

I certify that I have, in good faith, conferred with the attorneys of record for the plaintiff in an effort to obtain the discovery requested through this motion in order to avoid court action, but was unable to resolve the present dispute.

> /s/ Daniel J. Dwyer
> Daniel J. Dwyer

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 28th day of September, 2011.

/s/ *Daniel J. Dwyer*
Daniel J. Dwyer

*607173*