UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMORIM HOLDING FINANCERIA,    )
S.G.P.S., S.A.,               )
                              )
            Plaintiff,        )    CIVIL ACTION NO.
                              )    09-10641-DPW
v.                            )
                              )
C.P. BAKER & CO., LTD. and    )
CHRISTOPHER P. BAKER,         )
                              )
            Defendants.       )
                              )


MEMORANDUM AND ORDER
September 30, 2014

        Amorim Holding Financeira S.G.P.S., S.A. ("Amorim Holding")

filed this suit against C.P. Baker & Co., Ltd. and its principal,

Christopher P. Baker (collectively, "Baker"), alleging violations

of the Massachusetts Securities Act, fraud, negligent

misrepresentation, breach of fiduciary duty, and unfair and

deceptive trade practices in violation of Massachusetts General

Laws chapter 93A in connection with certain investments Amorim

made with Baker.  Baker answered the complaint with counterclaims

for misrepresentation, breach of warranty, and indemnification

against Amorim.  The parties have presented cross motions for

summary judgment as to each other's claims.

# I. BACKGROUND

## A. *Amorim's Introduction to Baker*

Amorim Holding Financeira S.G.P.S., S.A. ("Amorim Holding") is a family-owned company located in Portugal. In 2003, the president of Amorim Holding, Americo Amorim ("Amorim"), had fallen short on an investment in a company called FiNet. Bob Beuret, an employee of C.P. Baker & Co., Ltd., a Delaware investment management company with a principal place of business in Boston, suggested that Amorim meet with Christopher Baker, the president and CEO of C.P. Baker & Co for help making up the deficit in the FiNet investment. Baker specialized in venture capital and private equity investments. After meeting Amorim and his representatives, Baker agreed to help Amorim with the FiNet investment.

In a February 2004 meeting with Amorim, Baker explained his investment philosophy of leveraging his managerial expertise to create value in private companies. He highlighted his investment experience and successes, such as his investment of a few million dollars in a company called Zone Perfect that turned into a $165 million sale in 2003. Baker also gave Amorim a tour of his office in Boston. Amorim was impressed, and agreed to invest with Baker. Baker mentioned during the meeting that he was starting an investment fund, called the Anasazi III Offshore Fund

("Anasazi III").  By the end of the meeting, Amorim agreed to invest in Anasazi III.

### 1.   Morris Holdings Invests with Baker

Shortly thereafter, a Gibraltar-based entity, Morris Holdings Ltd., invested $5 million in Anasazi III.  Morris Holdings is a holding company for two Lichtenstein trusts, the beneficiaries of which are individual members of the Amorim family.  Morris Holdings was represented by counsel for each of its investments, but is not a named plaintiff in this case.

From 2004 through 2006, Morris Holdings also invested in a number of start-ups and other privately held companies through Baker.  It invested in On-Card Inc., a direct-mailing company; Z-Force Partners LLC, a children's action cartoon production company; American Entertainment Holding Company, LLC, a movie-script intellectual property licensing company; and Chime Entertainment LLC, a music production company.

Each investment was subject to a purchase or subscription agreement, and Amorim Holding alleges that Baker made misrepresentations about each and every investment Morris Holdings made.  Morris Holdings continues to hold some of the investments, has sold some, and has transferred others to other Amorim-affiliated entities.  I summarize below the purchase or subscription agreements associated with each individual

-3-

investment, along with the misrepresentations Baker allegedly
made in connection with those investments.  I also note the
status of the investment as of the briefing and argument of the
summary judgment motions.  The parties have not further
supplemented this information.

    *a.  Anasazi III*

    i.  The Investment

The Application Form Morris Holdings signed on April 2, 2004
as a part of its investment of $5 million in Anasazi III
represented that it possessed "the knowledge, expertise and
experience in financial matters to evaluate the risks of
investing" in Anasazi III and understood "the risks inherent in
investing" in Anasazi III, including "the risk of loss of [its]
entire investment."  Morris Holdings also received a private
placement memo which, among other things, warned Morris Holdings
that it could lose everything it invested in Anasazi III, and
could not rely on any representation or warranty not contained in
the written documents it had received or any representation or
warranty relating to the economic return of Anasazi III.

The Application Form contained a section titled
"Indemnification," wherein Morris Holdings acknowledged that it
would indemnify "the Fund, the Manager, the Administrator and
their respective directors, officers and employees against any

loss, liability, cost or expense (including without limitation attorneys' fees, taxes and penalties) which may result directly or indirectly, from any misrepresentation or breach of any warranty, condition, covenant or agreement set forth herein or in any other document delivered by the Investor to the Fund." Baker was listed as the "Manager" of Anasazi III.

    ii. Alleged Misrepresentations

    The private placement memo also represented that the value of the companies which Anasazi III had an interest in would be valued at a "fair value as determined in good faith by [Baker], in consultation with the Administrator" of the Fund. Amorim Holding contends that Baker did not consult the Administrator of Anasazi III in valuing the companies Anasazi III had an interest in, nor did he provide a fair valuation in good faith.

    iii. Transfer of Interest

    Morris Holdings sold its shares of Anasazi III to Amorim Alternative Investments, a wholly-owned subsidiary of Amorim Holding, for $1.8 million in the fall of 2008.

    *b. On-Card*

    i. The Investment

    Morris Holdings made four separate investments in On-Card. These were in the amounts of $700,000 on November 23, 2004;

$900,000 on December 9, 2004; $200,000 on November 3, 2005; and $100,000 on January 31, 2006.[1]

Each investment involved execution of a Subscription Agreement with On-Card. By signing the On-Card Subscription Agreement, Morris Holdings "recognize[d] that the [investment] involve[d] a high degree of risk." The Agreement warned that the investments were illiquid, because "transferability [was] extremely limited." It also warned that Morris Holdings could lose its entire investment. Morris Holdings warranted that it was "sufficiently experienced in financial and business matters to be capable of evaluating the merits and risks of an investment in the company" and that it had, in fact, "evaluated the merits and risks of [its] proposed investment." The Subscription Agreement also noted that Morris Holdings would have to hold the shares for an indefinite period of time.

Like many of the other agreements, the On-Card Subscription Agreement included an integration clause, stating that the "Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof. This agreement

---

[1] The money for the first investment was wired in two installments, on November 5, 2004 and November 15, 2004. The money for the second investment was wired on December 7, 2004. The money for the final two investments was wired on October 25, 2005. All transfers occurred before the respective Subscription Agreements were signed by the parties.

supersedes all prior negotiations, letters and understandings
relating to the subject matter hereof."  It also included an
indemnification clause, wherein Morris Holdings agreed to
indemnify On-Card "and its affiliates, directors, officers,
trustees, managers, employees and representatives . . . from and
against any Losses suffered, sustained, incurred or required to
be paid by any such [party] due to, based upon or arising out of
any material inaccuracy in, or any material breach of, a
representation or warranty of the Subscriber contained in this
Agreement."  Baker was defined in the agreement as On-Card's
"Placement Agent."

ii.  Alleged Misrepresentations

On October 25, 2004, Baker sent Amorim Holding an email
suggesting that it invest in On-Card because On-Card's "product
margins are extremely attractive."  That email represented that
Baker and the Anasazi Funds had already invested $900,000 in On-
Card, and suggested that Amorim Holding and Baker "should . . .
jointly invest a total of $1.4 million ($700k/$700k)" more in On-
Card.  On June 11, 2005, Baker sent Amorim Holding an email
suggesting that On-Card was "exploding," and on October 21, 2005,
continued to assert that On-Card had "great potential."

Amorim Holding alleges that in a May 2006 meeting, Baker
told it that On-Card would have an initial public offering within

two years, and that such an offering would lead to a two to five times return on its initial investment.  In late 2006, Baker also allegedly assured Amorim Holding that he would replace On-Card's CEO with a more experienced one to improve the management of the company.  Amorim Holding contends that all of these representations were false.

iii.  No Transfer of Interest

Morris Holdings continues to hold the interest it purchased in On-Card in the four investments from 2004 through 2006.

*c.  Z-Force*

i.  The Investment

As with the Anasazi III investment, Morris Holdings signed a Subscription Agreement for a $900,000 investment in Z-Force on December 28, 2004.[2]  By signing the Agreement, Morris Holdings acknowledged that its investment "involves an extremely high degree of risk and is suitable only for sophisticated investors." It agreed that it would "continue to bear the economic risk of [the] investment for an indefinite period" because the stock was not registered and thus could not be sold.  The Agreement also warned that Baker could have potential and actual conflicts of interest arising from the investment as a result of his

---

[2]  Amorim Holding wired the money for the investment on November 15, 2004, before signing the subscription agreement.

managerial role with the company, and Morris Holdings acknowledged those potential conflicts by signing the Agreements. Unlike many of the other investment agreements, the Morris Holdings Z-Force agreement did not include an indemnification clause.

ii.  Alleged Misrepresentations

In e-mails to Amorim, Baker suggested that the two were "partners" and that Baker would match some of Amorim's investments dollar for dollar.  Amorim Holding claims that although it invested $900,000, Baker invested only between $300,000 and $500,000 in Z-Force, when Baker had said that the investment would be "[i]n keeping with our 'full partner' philosophy," which Baker stated at his deposition meant that "[g]enerally speaking, we would invest similar amounts of money in the deals."

Amorim Holding claims that Baker represented to it in December 2004 that the minimum return on its investment in Z-Force would be double its initial investment within two to three years, but that such a return has not come to light.

iii.  Transfer of Interest

In 2007, Morris Holdings transferred its Z-Force shares for face value to AHFB-IV, a wholly owned subsidiary of Amorim

Holding, through a simultaneous redemption/repurchase transaction.

    *d.  American Entertainment Holding*

    i.  The Investment

Morris Holdings invested $2.5 million in American Entertainment Holding on June 15, 2005.  In a Subscription Agreement executed on that date, Morris Holdings represented that it carefully reviewed and understood all of the documents and records pertaining to the investment that it needed; that it had a reasonable opportunity to ask questions about the investment; and that it was sufficiently experienced in financial and business matters to make its own judgment about the investment. The American Entertainment Agreement also included an integration clause in which Morris Holdings agreed that the Subscription Agreement "sets forth the entire agreement and understanding among the parties hereto . . . and supersedes any and all prior agreements and understandings relating to the subject matter hereof."

Under a provision titled "Indemnification," Morris Holdings agreed to indemnify American Entertainment Holding "and its Managers against any and all Damages incurred in connection with or arising out of or resulting from (i) any inaccuracy or breach of any representation or warranty made by [Morris Holding] in or

pursuant to this Agreement . . . ."  Damages is defined in the

agreement as "costs, losses (including, without limitation,

diminution in value), liabilities, damages, lawsuits,

deficiencies, claims, taxes and expenses . . . including, without

limitation, interest, penalties, reasonable attorneys' fees and

all amounts paid in investigation, defense or settlement of any

of the foregoing."  Baker signed the agreement on behalf of

American Entertainment Holding as its Managing Member, and is

defined in the agreement as one of the "Managers" of the Company.

    ii.   Alleged Misrepresentations

In an email dated October 6, 2004, Baker said that American

Entertainment was "one of those truly great investments."  Amorim

Holding alleges that Baker told it in June 2005 that American

Entertainment was the type of deal that always makes money, and

that a film fund of $100 million was being arranged.  It also

alleges that during a meeting in July 2006, Baker represented

that American Entertainment was expected to have an initial

public offering "in the very short term."  Amorim Holding

contends that all of these statements were false.

    iii.  Transfer of Interest

On September 28, 2011, after the initial discovery deadlines

in this case, Morris Holdings transferred its interest in

American Entertainment Holding to AHFB-I, Inc., a wholly-owned
subsidiary of Amorim Holding, for $250,000.

    *e.   Chime*

    i.   The Investment

Morris Holdings wired $1.5 million to Chime in installments
between June 28, 2005 and September 6, 2005, and signed a
purchase agreement on August 23, 2005.  In the Chime Purchase
Agreement, Morris Holdings acknowledged that it was "a
sophisticated investor" that "could bear the economic risk of the
investment, and has such knowledge and experience in financial or
business matters in general and in particular with respect to
this type of investment as to be capable of evaluating the merits
and risks of an investment" in Chime.  Morris Holdings explicitly
acknowledged that its investment in Chime was "highly speculative
and involve[d] numerous risks and uncertainties," and that it
"evaluated and underst[ood] the risks and terms of investing" in
Chime.  The agreement also included an integration clause.

The Chime Purchase Agreement also included an exhibit titled
"Risk Factors" disclosing the risks of investing in Chime.  That
exhibit began by warning Morris Holdings that it would "be
required to bear the financial risks of [the Chime investment]
for [an] indefinite period of time," and that the investment was
"highly speculative and involve[d] a high degree of risk."  The

risk factors included things such as that the shares could not be transferred or resold except under a few exceptions; that the company had "no operating history" and thus "there can be no assurance that the business of [Chime] will, over the long term, be a viable commercial enterprise"; and that the company's revenues came from a small number of properties and was seasonal, mainly dependant upon holiday sales, among other risks.

The Chime Purchase Agreement included an indemnification clause wherein Morris Holdings agreed to indemnify Chime "and the Managers from and against all losses or liabilities (including, without limitation, reasonable attorneys' fees) asserted by, or on behalf of, the Investor or any beneficiary thereof against the Managers, its members, or partners, or any of their respective controlling persons, shareholders, members, principals, directors, officers, employees and other agents, in connection with this Agreement, for any act taken or omitted in good faith in discharging its obligations hereunder to the extent that such act or omission does not involve gross negligence, willful default, fraud, dishonesty, reckless disregard of a material obligation or duty, or violation of applicable law." Baker signed the Chime Purchase Agreement on behalf of Chime as its "Managing Member."

ii.  Alleged Misrepresentations

Amorim Holding contends that in August 2005, Baker assured Amorim that any investment in Chime would have a minimum return of five times the initial investment within two to three years. On December 13, 2005, Baker sent Amorim Holding an email stating that it "[l]ooks like Chime will be working with Coca-Cola, Starbucks, and Starwood Hotels." On January 18, 2006, Baker sent another email to Amorim Holding suggesting that it "consider increasing [its] investment" in Chime because the company "is flying" and has been having "a large number of very positive things happening." Amorim Holding contends that these statements were false.

iii.  Transfer of Interest

In 2007, Morris Holdings transferred its Chime shares to AHFB-I, Inc., for face value, through a simultaneous redemption/repurchase transaction.

## 2.  *Sotomar Invests with Baker*

Morris Holdings was not the only company affiliated with Amorim to invest with Baker. A company named Sotomar Empreendimentos Industriais E Imobiliarios, SA, invested through Baker in a voice-over-IP telephony company called One IP Voice,

then known as Farmstead Telephone Group.[3]  Amorim is on the board

of Sotomar.  Sotomar, however, is not a named plaintiff in this

case.

1.  <u>The Investment</u>

The February 8, 2006 One IP Voice Purchase Agreement, signed

by Sotomar, contained a section of warranties made by Sotomar to

One IP Voice.  In that section, Sotomar acknowledged that it

understood that the shares it was purchasing were not registered

and therefore it would have to hold them "indefinitely unless

they are registered," and that "no public market now exists for

any of the securities issued by [One IP Voice]."

The Purchase Agreement also contained an integration clause,

which stated that the Purchase Agreement "constitute[d] the

entire agreement between the parties . . . and any and all other

written or oral agreements existing between the parties" were

thereby "expressly canceled, and no party shall be liable or

bound to any other party in any manner by any warranties,

representations, or covenants, expect as specifically set forth

herein."  Sotomar also agreed that it was "not relying upon any

person, firm or corporation, other than [One IP Voice] and its

---

[3]  Sotomar wired $1 million to One IP Voice on February 22, 2006.
Sotomar purchased an additional $1 million worth of stock in One
IP Voice on March 17, 2006.

representatives, in making its investment or decision to invest in [One IP Voice]."

Unlike a number of the other purchase agreements, the One IP Voice agreement did not include an indemnification clause. It did include a provision specifying that "[i]f any action at law or in equity . . . is necessary to enforce or interpret the terms of any of the Transaction Documents, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled."

### 2. Alleged Misrepresentations

Amorim Holding alleges that Baker told it that its investment in One IP Voice would yield a five-fold return within ten months, because another investor was lined up to redeem Amorim Holding's investment. Amorim Holding contends that this statement was false.

### 3. No Divestment

Sotomar continues to hold its interest in One IP Voice.

### D. Amorim Holding Invests with Baker

Amorim Holding invested through Baker in two additional ways: by purchasing shares redeemed by Morris Holdings and through direct investments in four companies.

1.  <u>Purchases of Shares Redeemed by Morris Holdings</u>

As noted above, in 2007, Morris Holdings redeemed its interests in Chime and Z-Force for face value.  Simultaneously, Amorim Holding, represented by counsel, purchased the redeemed shares by executing new purchase contracts.[4]  Although the shares of both Chime and Z-Force were illiquid, it appears that those companies permitted simultaneous redemptions and repurchases on the grounds that they were essentially just paper transfers from one Amorim-related entity to another.

The new purchase agreements executed by Amorim Holdings contained essentially the same warnings, disclosures, and agreements as the original purchase agreements.  Supplemental disclosure memoranda were included, providing up-to-date disclosures concerning risks of the investment and the companies' financial conditions at the time of the new purchase agreements.

2.  <u>Direct Investments</u>

In addition to purchasing shares redeemed by Morris Holdings, Amorim Holding directly invested in four companies during this time period through Baker: MySky Communications, Inc., a weather satellite software company; Chime; Z-Force; and Remote MDx, a medical bracelet company.

---

[4]  It appears this was done for reasons related to Portuguese tax considerations.

*a.  MySky*

On December 30, 2005, Amorim Holding signed a Purchase
Agreement to invest $500,000 in MySky.  In that Agreement, Amorim
Holding represented that it had an opportunity to discuss MySky's
business, management, and financial affairs, as well as the terms
and conditions of the Purchase Agreement, with MySky's management
and that it understood that no public market existed for the
MySky shares.  The Purchase Agreement contained an integration
clause which stated that the Purchase Agreement "constitute[d]
the entire agreement between the parties" and expressly canceled
"any and all other written or oral agreements existing between
the parties."  That clause also stated that "no party shall be
liable or bound to any other party in any manner by any
warranties, representations, or covenants, except as specifically
set forth herein."  The Agreement does not include an
indemnification provision, though it does provide that "[i]f any
action at law or in equity . . . is necessary to enforce or
interpret the terms of any of the Transaction Documents, the
prevailing party shall be entitled to reasonable attorney's fees,
costs and necessary disbursements in addition to any other relief
to which such party may be entitled."

Amorim Holding alleges that in January 2007, Baker represented to it that by 2009, its investment in MySky would double.  It contends that this statement was false.

*b.  Chime*

On December 15, 2006,[5] Amorim Holding directly invested in Chime in a similar manner as Morris Holdings had done earlier. The investment agreement contained an indemnification clause promising that Amorim Holding will indemnify Chime and its Managers (of which Baker was one) "from and against any and all loss, damage, liability, cost or expense due to or arising from a breach of any representation, warranty or agreement contained" in the purchase agreement.

Amorim Holding alleges that in July 2006, Baker represented to it that he had secured additional sources of investment for Chime, which would improve the company.  In an email on January 16, 2007, Baker proclaimed that Chime had "[l]ots of potential this year."  Amorim Holding contends this was false, because in February 2007, Baker had learned through an email that as of January 2007 Chime would not have enough cash to continue operating past February 2007.

---

[5]  Amorim Holding wired $500,000 to Chime on December 14, 2006.

*c. Z-Force*

In May 2007, Amorim Holding directly invested $900,000 in Z-Force in a similar manner as Morris Holdings had done previously. Amorim Holding alleges that in July and October of 2006, Baker represented that he would replace Z-Force's management to improve the company. Unlike the Morris Holdings investment, the 2007 Z-Force purchase agreement included an indemnification clause. That clause stated that Amorim Holding would hold harmless Z-Force, "its managers, employees, consultants, affiliates and any employees thereof, and all past, current and future members of the Company . . . from and against any and all payments, costs, liabilities, penalties, fines, taxes, damages, losses and other expenses (including, without being limited to, reasonable attorneys' and accountants' fees) . . . that are a result of the transaction contemplated in this Agreement."

*d. Remote MDx*

By 2007, a number of Amorim Holding's investments had failed or substantially decreased in value, and Amorim Holding lost most of its investment in the various companies. Around this time, Baker offered Amorim an additional opportunity which he thought gave Amorim a chance to make up for his losses. That investment was to purchase $18.5 million of shares in a publicly-traded company, Remote MDx, and then sell a "put" option to a third

company, Vatas Holding GmbH.  The put option required Vatas to purchase the Remote MDx shares for $21.5 million on July 31, 2008, if Amorim Holding desired to sell the stock on that date. Baker estimated that the return from selling the put would be $3 million, approximately offsetting some of the losses Amorim had already incurred from other investments Baker had recommended.

Before purchasing the Remote MDx shares, Amorim Holding employees reviewed financial data about Vatas and investigated the company's connections with some South African companies, including diamond mining operations.  Amorim hired the law firm of Goodwin Procter LLP to review the put contract.  After evaluating the information he had obtained, Amorim thought that Vatas was "an extremely solid group."

Amorim Holding alleges that Baker assured it that the Remote MDx investment was going to be risk-free with a virtually guaranteed return.  It also contends that Baker instructed it not to mention the investment to anyone else because it was such a good opportunity.  Amorim Holding claims that Baker was offering Amorim Holding the Remote MDx investment to compensate it for its losses on the other investments Baker had suggested.

Amorim Holding claims that Baker omitted to inform it that a "market-maker" in Remote MDx was preparing to sell a "huge block" of Remote MDx shares and thus dilute the value of Amorim

Holding's interest in Remote MDx.  It also alleges that Baker
failed to disclose that he knew that Vatas would not be able to
honor the put because it was overextending itself in the market.
However, there is virtually no evidence in the record regarding
Baker's knowledge–at the time he sold the Remote MDx investment
to Amorim–of the prospective activity of the "market-maker" or
the inability of VATAS to honor the put.

    Amorim Holding purchased the shares and sold the put option
to Vatas.  Vatas, however, declared insolvency and did not honor
the Amorim put.  Consequently, Amorim did not make any profit on
its purchase of the Remote MDx shares and indeed, after a drop in
the price of the stock, Amorim lost most of its $18.5 million
investment.

## II.  STANDARD OF REVIEW

    A moving party is entitled to summary judgment when "the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence
about the fact is such that a reasonable jury could resolve the
point in the favor of the non-moving party," and "[a] fact is
material if it has the potential of determining the outcome of
the litigation." *Farmers Ins. Exch.* v. *RNK, Inc.,* 632 F.3d 777,
782 (1st Cir. 2011) (citation omitted).  However, "conclusory

allegations, improbable inferences, and unsupported speculation"
are insufficient to create a genuine issue of material fact to
survive summary judgment. *Sullivan* v. *City of Springfield*, 561
F.3d 7, 14 (1st Cir. 2009) (quotation and citation omitted).

I "view the facts in the light most favorable to the party
opposing summary judgment." *Rivera-Colón* v. *Mills*, 635 F.3d 9,
10 (1st Cir. 2011). Because I am addressing cross-motions for
summary judgment, I "must view each motion, separately, through
this prism." *Estate of Hevia* v. *Portrio* , 602 F.3d 34, 40 (1st
Cir. 2010).

### III.  BAKER'S MOTION FOR SUMMARY JUDGMENT

Amorim Holding's complaint asserts five causes of action:
violation of the Massachusetts Securities Act, Massachusetts
General Laws chapter 110A section 410 (Count I); fraud (Count
II); negligent misrepresentation (Count III); breach of fiduciary
duty (Count IV); and violation of Massachusetts General Laws
chapter 93A (Count V). Baker has moved for summary judgment on
all of Amorim Holding's counts.

Baker contends that (A) all claims arising from purchases of
securities by Morris Holdings or Sotomar fail because Amorim
Holding is not the real party in interest. He further argues
that (B) the Massachusetts Securities Act claims fail because (i)
Amorim Holding has not tendered or sold its Remote MDx shares;

(ii) if any misrepresentations were made with regard to Remote
MDx, Amorim Holding knew they were false, and (iii) Amorim
Holding was not the original purchaser of the Morris Holdings and
Sotomar investments in Anasazi III, Chime, Z-Force, American
Entertainment Holding, or On-Card.  In addition, Baker contends
that (C) the fraud and negligent misrepresentation claims fail
because (i) no misrepresentations were made as to Remote MDx;
(ii) Amorim Holding did not reasonably rely on representations
Baker did make with regard to Remote MDx; (iii) the Purchase and
Subscription Agreements fully disclosed the risks of each
investment that Amorim Holding made; and (iv) many of the alleged
misrepresentations post-dated the investments and are therefore
not actionable.  Baker also argues that (D) the breach of
fiduciary duty claims fail because they are derivative and the
complaint fails to meet the requirements of Federal Rule of Civil
Procedure 23.1.  Finally, Baker contends that (E) the chapter 93A
claim fails because all the other claims of deception or unfair
practices have failed.  I address each of Baker's multifold
arguments in turn.

**A.    *Real Party in Interest***

    <u>1.</u>  <u>Legal Background</u>

Baker contends that Amorim Holding is not the real party in
interest with respect to investments made between 2004 and 2006

by Morris Holdings and Sotomar.  Under Federal Rule of Civil
Procedure 17, "[a]n action must be prosecuted in the name of the
real party in interest," that is, in the name of the person who
is entitled to enforce the right asserted under the governing
substantive law.  Fed. R. Civ. P. 17(a)(1); 6A CHARLES ALAN WRIGHT &
ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1543 (3d ed.).  Because
I sit in diversity in this case, I look to the state substantive
law governing Amorim Holding's claims of violations of the
Massachusetts Securities Act, fraud, negligent misrepresentation,
breach of fiduciary duty, and violation of Massachusetts General
Laws chapter 93A, to shape determination of the federal
procedural question whether Amorim Holding is the real party in
interest.  *See generally Erie R.R. Co.* v. *Tompkins*, 304 U.S. 64
(1938).  Ultimately, real party in interest status and the
consequences which flow from that are procedural matters of
federal law.  *See University of Rhode Island* v. *A.W. Chesteron
Co.*, 2 F.3d 1200, 1205 n.8 (citing *Moor* v. *Alameda Cnty.,* 411
U.S. 693, 720 (1973)).

    2.  <u>Analysis</u>

    a.  *Massachusetts Securities Act Claims*

The Massachusetts Securities Act provides in part that "any
person who . . . offers or sells a security by means of any
untrue statement of a material fact or any omission to state a

material fact . . . is liable *to the person buying the security from him . . . .*"  Mass. Gen. Laws ch. 110A § 410(a)(2) (emphasis added).[6]  Here, Baker contends that "the person[s] buying the security" were Morris Holdings and Sotomar for the 2004-2006 investments in Anasazi III, Chime, Z-Force, American Entertainment Holding and On-Card, and Sotomar for One IP Voice, because Morris Holdings or Sotomar, not Amorim Holding, signed the purchase and subscription agreements for those investments and paid for the securities.  Amorim Holding claims that the misrepresentations at issue in this lawsuit were made to its employees, who then acted on them by making investments through Morris Holdings and Sotomar, and accordingly, Amorim Holding is the real party in interest for its Massachusetts Securities Act claim.

It is undisputed that Morris Holdings and Sotomar were the formal parties to the 2004-2006 purchase and subscription agreements through which the Anasazi III, Chime, Z-Force, American Entertainment Holding, On-Card, and One IP Voice investments were made.  The record also demonstrates that the funds for each of those investments came from Morris Holdings or

---

[6]  As is relevant here, it also imposes joint and several liability on "every broker-dealer or agent who materially aids in the sale."  Mass. Gen. Laws ch. 110A § 410(b).

Sotomar, or from one of their parent companies, Foundation Pamalu or Foundation Lumapa. Thus, Morris Holdings and Sotomar were the "buyers" for purposes of the Massachusetts Securities Act, and Morris Holdings and Sotomar, not Amorim Holding, are the real parties in interest with regard to the listed 2004-2006 investments.

This deficiency, however, is not fatal to Amorim Holding's claim. Authorized representatives of Morris Holdings, Sotomar, and various other holding companies, have ratified this action by Amorim Holding and thus Amorim Holding contends that it is a real party in interest under Fed. R. Civ. P. 17(a)(3). Rule 17(a)(3) provides that a "court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify . . . the action." Fed. R. Civ. P. 17(a)(3).

Baker contends that the ratifications did not come within a reasonable time and consequently should be treated as ineffective. This issue comes as no surprise to Amorim Holding. Baker first objected that Amorim Holding was not the real party in interest in his motion to dismiss filed in mid-2009. Baker maintained its objection in its motion for summary judgment, filed January 9, 2012. The ratifications provided by Morris

Holdings and others were not filed until March 2012, after the close of discovery, in the middle of summary judgment motion practice, and close to three years after Baker first objected that Amorim Holding was not the real party in interest.

As the Wright & Miller section on Rule 17(a)(3) notes, "Rule 17(a)(3) is designed to avoid forfeiture and injustice when an understandable mistake has been made in selecting the party in whose name the action should be brought . . . ." 6A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1555. Baker claims that Amorim Holding did not make an "understandable mistake," but instead deliberately avoided bringing suit Morris Holdings as a plaintiff. This choice was made because as Maria Amorim disclosed at her deposition, "Morris [Holdings] works as a cash safeguard, as an equity safeguard" for the Amorim family. Baker claims Amorim did not bring suit in Morris Holdings' name to protect personal assets from counterclaims.

When Baker first argued that Amorim Holding was not the real party in interest in its motion to dismiss, Judge Gertner denied the motion by margin note, ruling that Amorim was the real party in interest to all claims raised in the complaint. After the case was transferred to my docket in anticipation of Judge Gertner's retirement, Baker revived the argument through its summary judgment motion in 2012, and Amorim Holding produced the

challenged ratifications.  In light of Judge Gertner's ruling,
which Amorim Holding might reasonably have regarded as obviating
the need for any ratification, I will allow the ratifications as
having been filed within a reasonable time.  Thus, Baker's first
defense to Amorim Holding's claims fails.

      *b.  Fraud, Negligent Misrepresentation, and 93A Claims*

      As to the fraud and negligent misrepresentation claims,
under Massachusetts law "[o]ne who makes a fraudulent
misrepresentation[7] is subject to liability *to the persons or
class of persons whom he intends or has reason to expect to act*
or to refrain from action in reliance upon the misrepresentation
. . . ."  *Reisman* v. *KPMG Peat Marwick LLP*, 787 N.E.2d 1060, 1067
(Mass. App. Ct. 2003) (emphasis added); *see also Marram* v.
*Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1031 n.25 (Mass.
2004) ("A defendant is liable for negligent misrepresentation if
in the course of his business, he supplies false information for
the guidance of others in their business transactions . . . .").
Here, all of the alleged misrepresentations relating to the 2004–
2006 investments were directed to Amorim Holding employees and
Amorim himself, who then allegedly acted on them by making

---

[7]  Massachusetts cases variously refer to the tort of fraud as
"intentional misrepresentation," "fraudulent misrepresentation,"
and "deceit."  *See In re Access Cardiosystems, Inc.*, 404 B.R.
593, 638 n.60 (Bankr. D. Mass. 2009).

investments through various affiliated entities.  Thus, as to the fraud and negligent misrepresentation claims based on the Morris Holdings and Sotomar investments, Amorim Holding is a proper real party in interest under Rule 17(a).  Because the chapter 93A claim is based on the fraud and negligent misrepresentation claims, Amorim Holding is a real party in interest on that claim as well.

    *c.  Breach of Fiduciary Duty Claims*

    As to the breach of fiduciary duty claim, under Massachusetts law, a plaintiff must show (1) the existence of a duty of a fiduciary nature, based upon the relationship of the parties, (2) breach of that duty, and (3) a causal relationship between that breach and some resulting harm to the plaintiff. *Hanover Ins. Co.* v. *Sutton*, 705 N.E.2d 279, 288-89 (Mass. App. Ct. 1999).  Amorim Holding contends that Baker was acting as its investment advisor and thus owed it a fiduciary duty, which Baker breached in the various misrepresentations and omissions it alleges he made.  Under these circumstances, as with the fraud and misrepresentation claims, Amorim Holding is a proper real party in interest under Rule 17(a) for its breach of fiduciary duty claim.

**B.    *Massachusetts Securities Act Claims***

    1.  Legal Background

The Massachusetts Uniform Securities Act provides that any

person who

> offers or sells a security by means of any untrue
> statement of a material fact or any omission to state a
> material fact necessary in order to make the statements
> made, in light of the circumstances under which they
> are made, not misleading, the buyer not knowing the
> untruth or omission, and who does not sustain the
> burden of proof that he did not know, and in the
> exercise of reasonable care could not have known, of
> the untruth or omission, is liable to the person buying
> the security from him.

Mass. Gen. Laws ch. 110A § 410(a)(2).  Thus, for a plaintiff to

recover under § 410, he must show (1) that the defendant offered

or sold a security in Massachusetts; (2) by (a) making an untrue

statement of material fact, or (b) omitting a material fact

necessary to make a statement not misleading; (3) that the

plaintiff (a) did not know was false or (b) did not know was

omitted; and (4) the defendant knew or should have known in the

exercise of reasonable care was untrue or misleading.  *Id*.

Once the prima facie case has been made, the statute employs

a burden-shifting mechanism whereby the defendant must prove (1)

he did not know of the statement's falsity or that its omission

would make his statement misleading, or (2) he could not in the

exercise of reasonable diligence have discovered either the

statement's falsity or the misleading-causing nature of the
omission. *See, e.g.*, *Adams* v. *Hyannis Harborview, Inc.*, 838 F.
Supp. 676, 688 (D. Mass. 1993) (noting that under the
Massachusetts Securities Act the seller bears the burden to
establish his lack of negligence).

### 2. Analysis

Baker raises three defenses to Amorim Holding's
Massachusetts Securities Act claim. To the extent it is based on
the Remote MDx investment, Baker argues it fails because (i)
Amorim Holding has not tendered or sold its Remote MDx shares,
and (ii) if any misrepresentations were made with regard to
Remote MDx, Amorim Holding knew they were false and therefore
cannot make out a Massachusetts Securities Act violation. As to
the Morris Holdings and Sotomar investments in Anasazi III,
Chime, Z-Force, American Entertainment Holding, On-Card, and One
IP Voice, Baker argues the Securities Act claim fails because
(iii) Amorim Holding is not the original purchaser. Baker also
implicitly makes a fourth argument: that many of the alleged
misrepresentations were made post-investment, and thus cannot
give rise to Massachusetts Securities Act liability. I address
each argument in turn. I also take up the timing of the
misrepresentations in connection with the fraud and
misrepresentation claims in Section III.C.2.d, *infra.*

*a.  Lack of Tender or Sale*

Baker contends that Amorim Holding's Massachusetts
Securities Act claim fails with regard to the Remote MDx shares
because Amorim Holding has not tendered or sold its shares as
required by Massachusetts General Laws ch. 110A § 410(a)(2).
While he is correct that Amorim Holding has not yet tendered or
sold its shares, and it appears that such tender or sale is
required to recover under section 410(a)(2), the statute provides
that "[a]ny tender specified in [section 410] may be made at any
time before entry of judgment."  Mass. Gen. Laws ch. 110A §
410(c).  Because Amorim Holding still has time to tender or sell
its shares, Baker's first defense to Amorim Holding's Securities
Act claim fails at this point.

*b.  Amorim Knew Remote MDx Misrepresentations were
     False*

Under the Massachusetts Securities Act, if a buyer knows the
alleged misrepresentations are false, his claim is barred.  Mass.
Gen. Laws ch. 110A § 410(a) (requiring that the buyer "not know[]
of the untruth or omission" to make out a claim).

Amorim Holding points to a number of pre-investment
misrepresentations that it alleges Baker made about Remote MDx as
the basis for its Massachusetts Securities Act claim.  Amorim
Holding's primary allegation with regard to Remote MDx is that

Baker falsely assured it that the Remote MDx was a risk-free investment with a virtually guaranteed return, and concealed that Vatas could not honor the put.[8]

Baker contends that Amorim Holding knew that the investment was not risk free and did not have a virtually guaranteed return. Baker also claims he did not know that Vatas could not honor the put. The record supports Baker's contentions.

Amorim Holding acknowledged that on occasion before the Remote MDx investment, Baker had informed it that Baker "[could not] assure today an investment return in the future," because of securities regulations. When asked at its 30(b)(6) deposition whether Baker had ever "told [it] in so many words that [Remote MDx] was a risk free investment," Amorim Holding's representative said "No, I don't think he ever said this was a risk free investment."[9] While the Amorim Holding representative went on to say that Baker had suggested that he offered the Remote MDx

---

[8] Amorim Holding also alleges that Baker concealed that he owned Remote MDx shares, but that allegation is contradicted by the record which reveals that an email was sent to Amorim Holding in January 2007, one year before Amorim Holding's investment in Remote MDx, listing C.P. Baker's $2.8 million investment in Remote MDx.

[9] The same representative also admitted that when the Remote MDx investment was proposed, it was proposed as an opportunity "to offset the previous, the first two million [of One IP Voice], and [Baker] said that he was going to *try* to make it happen." (emphasis added). To try to attain a result, of course, is not to guarantee that result.

investment as an opportunity to make up Amorim Holding's losses,
that statement does not support Amorim Holding's claim that Baker
represented that the investment was "risk free" or "guaranteed."
In his deposition, Baker confirmed this, and stated "that under
securities law . . . we never guarantee investments."  Given this
record, I find as a matter of law no buyer would understand that
this investment was risk free.[10]

The record also contradicts the omissions and concealed
facts Amorim Holding alleges.  At his deposition, the managing
director of Vatas stated repeatedly that he never talked to Baker
about whether Vatas was giving other put options to investors
holding Remote MDx stock.  He directly stated that he did not
talk to Baker about Vatas's ability to honor the puts given to
Amorim Holding, and that such information was not otherwise
publicly available to Baker.[11]  Finally, in a single footnote,

_____

[10]  I recognize, of course, that the sophistication of the buyer
is not a per se defense to a claim under the Massachusetts
Securities Act.  *Marram* v. *Kobrick Offshore Fund, Ltd.*, 809
N.E.2d 1017, 1027 (Mass. 2004).  Here, I do not factor the
buyer's sophistication into the mix but I do consider the buyer's
admission that no representation was made that the investment was
actually risk free.

[11]  Amorim Holding makes much of the fact that Baker's employee,
Bob Beuret, claimed in his deposition in this case that he knew
the Remote MDx investment was a loser and never would have
recommended it to Amorim.  But there is absolutely no evidence in
the record to suggest that Mr. Baker was aware of Mr. Beuret's
opinion or the information on which it was based when he
recommended the investment to Amorim.

-35-

Amorim Holding contends that Baker concealed that "a market maker in Remote MDx stock was preparing to sell a huge block" which would dilute the market. That allegation is unsupported by the record, and is inadequately briefed in any event.

Thus, because the record is devoid of a misrepresentation or omission respecting the Remote MDx investment, or if a misrepresentation existed, one that Amorim Holding knew to be false, Amorim Holding's Massachusetts Securities Act claim with regard to its investment in Remote MDx fails.

c. *Not the Original Purchaser*

Related to the real party in interest issue above, but distinct, is the requirement under the Massachusetts Securities Act that the plaintiff be "the person buying the security" from the defendant. Mass. Gen. Laws ch. 110A § 410(a). The parties agree that this language has been interpreted to mean that the plaintiff must be the immediate purchaser, not a remote subsequent purchaser, of the security. *See* JOSEPH C. LONG, 12A BLUE SKY LAW § 9:40 n.1.

Relying on this construction, Baker argues that Amorim Holding's Massachusetts Securities Act claim fails as to investments made between 2004 and 2006 by Morris Holdings and Sotomar, since they, not Amorim Holding, were "the person[s] buying the securit[ies]." Amorim Holding argues that because it

is made up of the same individuals to whom Baker made the alleged misrepresentations that form the basis of its Massachusetts Securities Act claim, Amorim Holding as well as Morris Holdings and Sotomar should be treated as "the person buying the security."

In support of its position, Amorim Holding cites an example from Joseph Long's Blue Sky Law treatise which states that where "a parent corporation pays for the securities and, for unrelated business reasons, elects to have the title pass to one of its subsidiaries," then both the parent corporation and the subsidiary should be treated as original purchasers (people "buying the security") for purposes of the Massachusetts Securities Act. *Id.* § 9:40. Although that particular example is distinguishable from the facts here because we are dealing here with a somewhat looser organizational affiliation than a strict parent-subsidiary relationship, I am nevertheless persuaded that the Amorim-affiliated entities that currently hold the investments should be treated as the original purchasers in the circumstances of this case.

In 2007, Morris Holdings redeemed its shares in Chime and Z-Force for face value, and simultaneously Amorim Holding purchased those shares by executing new purchase and subscription agreements with Chime and Z-Force. Although the shares in both

companies were illiquid and Morris Holdings had no right to redeem them, the parties agree that the simultaneous redemption/repurchase transactions were permitted as a courtesy to Mr. Amorim, who sought to transfer ownership of the securities between entities under his control, purportedly for tax reasons. In 2008, Morris Holdings sold its shares in Anasazi III to a company called Amorim Alternative Investments for $1.8 million. On September 28, 2011, after the initial discovery deadlines had passed, Morris Holdings sold its shares of American Entertainment Holding to a wholly-owned Amorim Holding subsidiary for $250,000. Sotomar continues to hold the interest in One IP Voice, and Morris Holdings continues to hold the interest in On-Card.

As to the Chime and Z-Force shares that it redeemed in 2007, Morris Holdings was "the person buying the security," and thus the party who could sue under the Massachusetts Securities Act. Baker contends that, assuming Amorim Holding could sue in Morris Holdings' name as a result of the Rule 17(a)(3) ratification discussed above, Morris Holdings would be without a remedy because Morris Holdings' damages are $0.[12]  But the circumstances of those "redemptions" indicate that they were not true redemptions as contemplated by the Massachusetts Securities Act.

---

[12]  It is undisputed that Morris Holdings redeemed its Chime and Z-Force shares at face value, for a gain or loss of $0.

They were redemptions in form only, designed to procure Mr.
Amorim some tax benefit in Portugal.  Although not explicit from
the record, the parties appear to agree that the redemptions
would not have been allowed by the issuing companies absent the
understanding that another Amorim-affiliated entity under Mr.
Amorim's control would simultaneously repurchase the shares at
face value.  It is therefore as if no redemption had occurred,
and the Amorim-affiliated entities that now hold the shares are
appropriately treated as the original purchasers for the purposes
of the Massachusetts Securities Act claims.  What ultimately
matters is that the current holders of the shares are effectively
indistinct from the "original purchasers" that were the subject
of the misrepresentations alleged.

     As to the Anasazi III, American Entertainment Holding, and
On-Card shares, because Morris Holdings has ratified Amorim
Holding's claim and Morris Holdings was "the buyer of the
security," Amorim Holding's Massachusetts Securities Act claim
may go forward as to the On-Card shares.[13]  Although Baker
suggests that there is evidence that a redemption of the On-Card
shares was contemplated in 2007, there is no evidence in the

---

[13] I note however that in the case of the Anasazi III and
American Entertainment Holding shares, the price received when
those shares were sold, at substantial losses to other Amorim-
affiliated entities, will bear on the question of damages.

record in the form of a redemption/repurchase agreement showing that such a redemption occurred.

Likewise, as to the One IP Voice shares, because Sotomar has ratified its claim and given Amorim Holding permission to sue on it, and Sotomar was "the buyer of the security," Amorim Holding's Massachusetts Securities Act claim may go forward as to the One IP Voice shares.

     *d.  Not the "Means of" the Securities Sales*

As noted below, *infra* part III.C.2.d, some of the alleged misrepresentations that form the basis for Amorim Holding's fraud and negligent misrepresentation claims were post-investment. The focus of the Massachusetts Securities Act is on pre-investment information disclosure. *Cf*. *Marram*, 809 N.E.2d at 1025-27. The language of the Act itself focuses on the sale and the information available to the buyer during that period in time. *See* Mass. Gen. Laws ch. 110A § 410(a)(2) (creating liability for any person who "offers or sells a security by means of any untrue statement of a material fact" or omission). Post-investment misrepresentations, unconnected to the offer or sale of a security, then, cannot give rise to liability under the Massachusetts Securities Act, and any claims based on such misrepresentations fail as a matter of law.

*C.  Fraud and Negligent Misrepresentation Claims*

<u>1.</u>  <u>Legal Background</u>

Under Massachusetts law, to make out a fraud claim a plaintiff must show that (1) he is a person or within the class of persons as to whom (2) the defendant intended, or had a reasonable expectation would act (3) in reasonable reliance upon (4) a knowingly false statement made by the defendant. *Reisman*, 787 N.E.2d at 1067.  As to a claim for negligent misrepresentation, a defendant is liable "if in the course of his business, he supplies false information for the guidance of others in their business transactions, causing and resulting in pecuniary loss to others by their justifiable reliance on the information, with failure to exercise reasonable care or competence in obtaining or communicating the information." *Marram*, 809 N.E.2d at 1031 n.25.   The two causes of action share common elements: the plaintiff must show (1) that the defendant made a misrepresentation or omitted a fact; (2) that the statement was material; (3) that the defendant knew or should have known it was false; and (4) that the plaintiff reasonably relied on the misrepresentation.  The two differ in that negligent misrepresentation "does not require a showing that the defendant even knew that the statements made were false or that the defendant actually intended to deceive the plaintiff."  *Id.*

(quoting *Kitner* v. *CTW Transp., Inc.*, 762 N.E.2d 867, 874 (Mass. App. Ct. 2002)).

Some general observations may be made about the requirements of the fraud and negligent misrepresentation torts.

First, it is beyond debate that for a misrepresentation to be actionable, it must have, in fact, been false.[14] Generally, then, it must be a statement[15] of fact, not opinion. *Zimmerman* v. *Kent*, 575 N.E.2d 70, 75 (Mass. App. 1991). Exceptions exist, however. An opinion, prediction, or projection may be actionable where the speaker knew or should have known it was false at the time he made it. *See, e.g.*, *Pearce* v. *Duchesneau Group*, 392 F. Supp. 2d 63, 74 (D. Mass. 2005). Alternatively, a statement expressing a projection or opinion may give rise to liability if it is "not reasonably based on, or [is] inconsistent with, the facts at the time the forecast is made." *Glassman* v. *Computervision*, 90 F.3d 617, 627 (1st Cir. 1996).

---

[14] This element is common to the Massachusetts Securities Act claim as well. *See* Mass. Gen. Laws ch. 110A § 410(a)(2).

[15] This only applies to affirmative representations. Omissions are only actionable (1) where the defendant has a legal duty to disclose material information (e.g., as a fiduciary) and fails to do so, or (2) where the omission causes an otherwise accurate statement to be misleading at the time it was made. *See In re Access Cardiosystems, Inc.*, 404 B.R. at 642-44 (collecting cases).

Second, under Massachusetts law, "information is 'material' only if its disclosure would alter the 'total mix' of facts available to the investor and 'if there is a substantial likelihood that a reasonable shareholder would consider it important' to the investment decision." *Milton* v. *Van Dorn Co.*, 961 F.2d 965, 969 (1st Cir. 1992) (quoting *Basic, Inc.* v. *Levinson*, 485 U.S. 224, 231-32 (1988)). The inquiry is an objective one. *Id.* at 970. Puffery is not actionable because it is so vague and general as to be unimportant in the total mix of information. *See, e.g.*, *Glassman*, 90 F.3d at 635-36.

Finally, both causes of action require a showing of reasonable reliance. The First Circuit has looked to a number of factors in determining whether reliance was reasonable, including:

> (1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Kennedy* v. *Josephthal & Co., Inc.*, 814 F.2d 798, 804 (1st Cir. 1987). The First Circuit has held that no reasonable investor would rely on "optimistic predictions of future potential," as

long as the predictions are not, in fact, promises about certain future performance.  *Suna* v. *Bailey* , 107 F.3d 64, 70-72 (1st Cir. 1997);[16] *see Computervision*, 90 F.3d at 626 ("Forecasts are not guarantees of, or insurance policies for, a firm's future performance, nor are they understood as such by reasonable investors.").

    2.  <u>Baker's Asserted Defenses</u>

Baker contends that Amorim Holding's fraud and negligent misrepresentation claims fail.  As to those claims based on the investment in Remote MDx, Baker claims (i) no misrepresentations were made, or (ii) if any were made, Amorim Holding did not reasonably rely on them.  Third, for claims arising out of the investments in Anasazi III, Chime, Z-Force, American Entertainment Holding, On-Card, and One IP Voice, Baker seeks shelter in the risk disclosures of the Purchase and Subscription Agreements.  Finally, he argues that any misrepresentations that were made post-dated the investments and are therefore not actionable.  I address each argument in turn.

---

[16]  Although *Suna* involved claims arising under the Securities Act of 1933 and the Securities and Exchange Act of 1934, "similar elements of common-law claims for fraud and negligent misrepresentation are interpreted in accord with both federal and state securities laws."  *In re Access Cardiosystems, Inc.*, 404 B.R. at 641 n.64.

*a. No Misrepresentations Made as to Remote MDx*

Amorim Holding's fraud and misrepresentation claims based on the Remote MDx investment must fail for the same reason that the Massachusetts Securities Act claim arising from that investment fail: that the record discloses that Baker did not represent that the investment would be free of risk.

*b. Amorim Holding did not Reasonably Rely on Statements Regarding Remote MDx or Knew They Were False*

Even if a misrepresentation was made, Baker argues that Amorim Holding did not rely on it because it made its own investigation into the Remote MDx investment and agreed thereafter to invest. As noted above, before purchasing the Remote MDx shares, Amorim Holding employees reviewed financial data about Vatas and its connection to the Hersov family, a wealthy diamond-mining family in South Africa. After reviewing the information they had uncovered, Amorim Holding employees and Amorim himself felt comfortable that Vatas was a legitimate business with substantial levels of equity, in excess of $200 million. An Amorim Holding employee expressed the company's comfort with Vatas to Baker directly in an email, stating that Amorim Holding "already gathered information about Vatas and feel comfortable about their role as guarantors of the put." In other words, as the January 24, 2008 Amorim Holding meeting minutes

revealed, Amorim Holding felt that Vatas's "credibility was assured" after Amorim Holding had done the work "necessary to ensure" its credibility.

Amorim Holding's meeting minutes also disclose that Amorim Holding explicitly contemplated and created a contingency plan in the event that Vatas did not honor the put. The meeting minutes reveal that Amorim himself contemplated that a lawsuit would need to be brought in Germany against Vatas if it failed to purchase the shares at the agreed-upon price in July 2008.

Baker thus argues that Amorim Holding cannot now claim that it relied on any statements Baker made about the return on the investment being guaranteed, or Vatas being able to honor the put, since Amorim Holding performed its own investigation of the facts it thought were necessary to make its investment decision and explicitly contemplated the possibility that Vatas would not honor the put. Amorim Holding claims that its investigation did not, and could not, have uncovered the information Baker allegedly knew that Vatas could not have honored the put.

As noted above, a number of factors are relevant in determining whether a plaintiff's reliance was reasonable under the circumstances of the case: "(1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal

relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations." *Kennedy*, 814 F.2d at 804.

Although Amorim claims that it is not sophisticated, its namesake is one of the wealthiest men in Portugal and it controls millions of dollars in investments. No reasonable juror could find that Amorim was not a sophisticated investor. While Baker and Amorim Holding had a longstanding, arguably fiduciary relationship as of the time of the Remote MDx investment, it is undisputed that Baker did not and could not have known that Vatas was not going to be able to honor the put. Thus, Baker did not have any information that Amorim Holding did not have as a result of its investigation, did not conceal any alleged fraud, and Amorim Holding had the same opportunity to detect it as Baker did. Furthermore, Amorim Holding explicitly contemplated that Vatas would not honor the put, and under the above factors no reasonable jury could conclude that Amorim Holding reasonably relied on Baker's alleged misrepresentation that the investment was a risk-free, virtually guaranteed return.

Thus, because no reasonable jury could find that Amorim Holding reasonably relied on the alleged affirmative misrepresentations or omissions of Baker, summary judgment is appropriate regarding Remote MDx.

   *c.  Risks were Fully Disclosed in Purchase Agreements*

Baker next argues that the risk disclosures and integration clauses in the purchase and subscription agreements make any reliance by Amorim Holding on any alleged misrepresentations unreasonable as a matter of law.  Thus, Baker contends, Amorim Holding's fraud and negligent misrepresentation claims must fail.

Generally, an integration or merger clause will not bar a fraud claim, *Sound Techniques, Inc.* v. *Hoffman*, 737 N.E.2d 920, 924 (Mass. App. 2000), but will be enforced against a negligent misrepresentation claim, *id.* at 926-27.  However, in the securities context, the Massachusetts Supreme Judicial Court has held that where a purchase or subscription "agreement implicitly acknowledges [the defendant's] preinvestment oral statements to be part of the mix of preinvestment information available for the prospective buyer to weigh," then also "[i]mplicit . . . is the guarantee that whatever information . . . [is] provide[d] will be reliable."  *Marram*, 809 N.E.2d at 1032.  Thus, where a purchase or subscription agreement states that the defendant (an offshore fund in that case) "'will make available to each prospective

-48-

investor . . . the opportunity to ask questions of, and receive answers' from the offshore fund administrator concerning 'the terms and conditions of this offering of Shares,' and from the offshore fund manager concerning 'the investment program of the Fund'" and the "private offering memorandum further states that the administrator will provide the investor, on request, with such additional information 'necessary to verify the accuracy' of the memorandum as the administrator 'could acquire . . . without unreasonable effort or expense," then a merger or integration clause will not bar a negligent misrepresentation claim based on preinvestment oral statements. *Id.*

All of the investments except for the Morris Holdings investment in Z-Force and the Amorim Holding investment in Remote MDx included integration clauses in their purchase or subscription agreements. With the exception of the Anasazi III agreement, all of the investment agreements featuring integration clauses also included acknowledgments that the investor had an opportunity to obtain information from the company or its management before signing the agreement, such that they arguably could come within the scope of *Marram* concerning claims of negligent misrepresentation. Therefore, summary judgment on this basis is appropriate on Amorim Holding's negligent misrepresentation claims as to Anasazi III only. I now turn to

the applicability of the *Marram* exception to the other
investments.

Section 2.2(h) of the 2005 Chime purchase agreement entered
into by Morris Holdings contains a representation from the
Investor "that it has had an opportunity to ask questions and
receive answers from the Company regarding the terms and
conditions of the offering of the Purchased Interest . . . ."
The agreement defines the "Company" as Chime Entertainment, LLC.
Baker is defined as a "Manager" of the Company in the Agreement.
In the 2006 Chime purchase agreement entered into by Amorim
Holding, that clause reads: "the Company had provided the
undersigned with any assistance the undersigned has requested in
connection therewith."  Accordingly, the *Marram* exception
applies, and the integration clause does not bar Amorim Holding's
negligent misrepresentation claim regarding Chime.

One IP Voice's purchase agreement similarly included a
warranty that the "Purchaser has had an opportunity to discuss
the Company's business management, financial affairs and the
terms and conditions of the offering of the Securities with the
Company's management."  The "Company" is defined in the agreement
as Farmstead Telephone Group, Inc. (the prior name of One IP
Voice).  Baker is named as the "Placement Agent," and is
therefore a representative of One IP Voice.  Accordingly, the

*Marram* exception applies, and the integration clause does not bar Amorim Holding's negligent misrepresentation claim regarding One IP Voice.

On-Card's subscription agreement included an acknowledgment by the Subscriber (Morris Holdings) that it:

> had conducted, or been afforded the opportunity to conduct, an investigation of the Company and has been offered the opportunity to ask representatives of the Company questions about the Company's financial condition and proposed business and that Subscriber has obtained such information as Subscriber has requested, to the extent Subscriber has deemed necessary, to permit Subscriber to fully evaluate the merits and risks of an investment in the Company. Representatives of the Company have answered all inquiries that Subscriber has put to them concerning the Company and its proposed activities, and the offering and sale of the Notes.

The agreement defines the "Company" as On-Card, Inc., and like the One IP Voice agreement, defines Baker as the "Placement Agent." Accordingly, the *Marram* exception applies, and the integration clause does not bar Amorim Holding's negligent misrepresentation claim regarding On-Card.

MySky's purchase agreement included an acknowledgment by the Purchaser (Amorim Holding) that it "has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the Securities with the Company's management." The "Company" is defined in the Agreement as MySky Communications, Inc. Baker is not mentioned

in the Agreement.  There is no evidence that Baker was part of MySky's management or otherwise acting as an agent or representative of MySky.  Thus, the *Marram* exception does not apply, and the integration clause bars Amorim Holding's negligent misrepresentation claim as to the MySky investment.

In summary, summary judgment is appropriate on Amorim Holding's negligent misrepresentation claims arising from the Anasazi III and MySky investments because they each had purchase agreements containing integration clauses, and for the reasons stated above the *Marram* exception does not apply.  In contrast, the *Marram* exception applies to the Chime, One IP Voice, and On-Card investments, and summary judgment is thus inappropriate on this basis with respect Amorim Holding's negligent misrepresentation claims arising from those investments.

> *d.  Any Misrepresentations were Post-Investment and Therefore Not Actionable*

Baker also argues that all alleged misrepresentations that occurred post-investment are not actionable because they could not have causally influenced Amorim Holding's decision to invest in the companies recommended by Baker.  Furthermore, Baker argues, since the securities are illiquid and no public market exists for them, no damages can accrue for post-investment statements Baker allegedly made.

A number of the alleged misrepresentations were clearly made post-investment, and summary judgment is appropriate to the extent that Amorim Holding's fraud and misrepresentation claims are based on those alleged misrepresentations. Baker's alleged statement that an American Entertainment initial public offering was "in the very short term" was communicated after Morris Holdings' investment in the company, and thus cannot have been causally related to the decision to invest in the illiquid security. Likewise, claims that an On-Card IPO was imminent with a two to five times return on Amorim Holding's initial investment; that Baker would replace the On-Card CEO; that MySky would double Amorim Holding's investment by 2009;[17] and that Chime would be working with Coke and Starbucks, were all post-investment and therefore not actionable.

Amorim Holding bears the burden of proving that the alleged misrepresentations were pre-investment in this case, and it failed to meet that burden with its undated allegation that at some point Baker stated that an investment in One IP Voice should

_____

[17]  Because this is the only misrepresentation alleged to have been made with regard to MySky, all of Amorim Holding's claims based on that investment—Massachusetts Securities Act, fraud, and negligent misrepresentation claims—fail.

yield five times return, so fraud and negligent misrepresentation claims based on that alleged misrepresentation must also fail.[18]

As to the remaining alleged misrepresentations, there are genuine issues of material fact as to whether they were made pre- or post-investment.  There are also genuine issues of material fact with regard to the question of the application of the First Circuit's reasonable reliance factors for those statements that were made pre-investment.  Thus, as to the remaining alleged misrepresentations, summary judgment on the grounds that they were post-investment will be denied.

 e.  *Many Alleged Misrepresentations Are Not Otherwise Actionable*

As noted above, the First Circuit has held that no reasonable investor would rely on "optimistic predictions of future potential," as long as the predictions do not veer into the territory of promise.  *Suna*, 107 F.3d at 70-72.  In the words of the First Circuit, "[f]orecasts are not guarantees of, or insurance policies for, a firm's future performance, nor are they understood as such by reasonable investors."  *Computervision*, 90 F.3d at 626.  And it is well established that mere puffery is not

---

[18]  As with the alleged misrepresentation involving MySky, because this is the only misrepresentation alleged concerning One IP Voice, and it fails, all other claims based on that misrepresentation fail as well.

actionable because it is too vague to be relied upon by
reasonable investors.  *See Suna*, 107 F.3d at 72.

Here, a number of Baker's alleged misrepresentations fall
into these categories of representations which are not actionable
under either fraud or negligent misrepresentation causes of
action.  For example, Baker's characterizations of American
Entertainment Holding as a "great investment" and the "type of
deal that always makes money" are not the type of statement
relied upon by reasonable investors.  Nor does Baker's
characterization of On-Card as "exploding" and having "great
potential" with "extremely attractive product margins" give rise
to fraud and negligent misrepresentation liability.  Likewise,
Baker's claim in 2007 that Chime had "lots of potential this
year" is a future forecast akin to a prediction, not a promise.
*Suna*, 107 F.3d at 70-72.  Thus, to the extent that Amorim
Holding's fraud and negligent misrepresentation claims are based
on these alleged misrepresentations, they fail.

**D.    *Breach of Fiduciary Duty Claims***

As to Amorim Holding's breach of fiduciary duty claims,
Baker argues that they must be dismissed because they are
derivative, not direct, and fail to meet the requirements of
Federal Rule of Civil Procedure 23.1.  He also argues that
because no misrepresentations were made or material facts omitted

with regard to Remote MDx, no breach of fiduciary duty claim may stand as to that investment.

As noted above, to make out a claim for a breach of fiduciary duty in Massachusetts, Amorim Holding must show (1) the existence of a duty of a fiduciary nature, based upon the relationship of the parties, (2) that Baker breached that duty, and (3) a causal relationship between that breach and some resulting harm to the plaintiff. *Hanover Ins. Co.*, 705 N.E.2d at 288-89. Here, Amorim Holding alleges that Baker owed it the fiduciary duty of an investment advisor, and breached his duty by making misrepresentations and failing to disclose material facts about the companies he recommended Amorim Holding invest in. This claim is based on the same alleged statements and omissions that Amorim Holding's fraud and misrepresentation claims are based on. Amorim Holding also alleges Baker mismanaged the companies and charged excessive fees which drained them of capital.

1. Remote MDx

Because the record discloses no genuine issue of material fact to support Amorim Holding's contention that misrepresentations were made or material facts omitted by Baker with respect to Remote MDx, Amorim Holding's breach of fiduciary claim arising from the Remote MDx investment fails.

## 2. Derivative Claim

With respect to the other investments, Baker argues that Amorim Holding's breach of fiduciary duty claims are derivative and thus must meet the requirements of Federal Rule of Civil Procedure 23.1. That rule requires that for actions brought by shareholders to enforce the rights of a corporation, the complaint must (1) be verified; (2) make certain allegations that the plaintiff was a shareholder at the time of the facts giving rise to the complaint; and (3) state with particularity efforts to obtain action from the board of directors and the reasons for not obtaining the action. Fed. R. Civ. P. 23.1(b). Baker contends that Amorim Holding's claim fails to meet those requirements and therefore summary judgment is appropriate.

Whether a claim is direct or derivative, and thus whether Rule 23.1 is implicated, turns on two inquiries. First, who suffered the alleged injury? And second, who will recover if the claim is successful? *Tooley* v. *Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).[19] Where the harm alleged was suffered by the corporation, and the recovery would go to the corporation, the claim is derivative and must be dismissed if it fails to comply with Rule 23.1.

_____

[19] Whether an action is direct or derivative is determined by the law of the state of incorporation.

Here, Amorim Holding put has forth a number of bases for its breach of fiduciary duty claim.  First, it claims Baker made misrepresentations about the companies Baker recommended Amorim Holding invest in, and thus breached his fiduciary duty to Amorim Holding.  Second, Amorim Holding accuses Baker of making "unreasonably high valuations of Anasazi [III] and the Portfolio companies that enriched [Baker] at Amorim's expense."  Third, it contends that Baker "charged excessive management, consulting, performance, and brokerage fees to the Portfolio Companies, thereby bleeding them of necessary money, contrary to the interests of Amorim and therefore in breach of [his] fiduciary duty to Amorim."  Fourth, Amorim Holding contends that Baker "concealed from Amorim certain financial interests [Baker] had that conflicted with Amorim's interests – for example, Baker encouraged Amorim to invest more in Chime, One IP Voice, and [American Entertainment Holding], while concealing the fact that Baker had made bridge loans to those entities, and that he planned to apply Amorim's additional investment first to paying himself back."  Finally, Amorim Holding accuses Baker of "completely mismanag[ing] the Portfolio Companies, allowing them to go into business without adequate capital, thereby insuring their failure."  Amorim Holding contends that all of these are

direct, not derivative, claims which do not implicated Rule
23.1's requirements.

The first through fourth bases for Amorim Holding's breach
of fiduciary duty claim allege direct, not derivative, claims,
and therefore need not meet the requirements of Rule 23.1.  The
party harmed by the alleged breaches of fiduciary duty was Amorim
Holding, and Amorim Holding is the party that would recover if
its claims were successful.  However, to the extent that the
mismanagement (fifth) allegation is not duplicative of the
misrepresentation (first) basis for Amorim Holding's claim, it is
derivative because the harm was to the Portfolio Companies and
any resulting award would benefit the Companies themselves.
Thus, as a derivative claim, it triggers the requirements of Rule
23.1.  Failing to meet those requirements, Amorim Holding's
breach of fiduciary duty claim based on mismanagement fails.  As
to the other bases for the fiduciary duty claim, genuine issues
of material fact exist as to the duty, if any, owed by Baker and
whether Baker breached that duty.  Summary judgment is therefore
inappropriate as to all surviving misrepresentations.

**E.    *Chapter 93A Claim***

Amorim Holding's chapter 93A claim is based on its fraud,
negligent misrepresentation, and breach of fiduciary duty claims.

As such, to the extent that those claims survive summary
judgment, the 93A claim survives summary judgment as well.

<h3 style="text-align:center">IV. AMORIM'S MOTION FOR SUMMARY JUDGMENT</h3>

In his answer to Amorim Holding's complaint, Baker filed
three counterclaims: misrepresentation (Count I), breach of
warranty (Count II), and indemnification (Count III).  Amorim
Holding has moved for summary judgment on all of Baker's
counterclaims.

As to the misrepresentation and breach of warranty claims,
Amorim Holding contends that Baker has failed to assert
cognizable damages.  As to the indemnification claim, Amorim
Holding contends that the indemnification clauses (1) are
unenforceable as a matter of public policy, and (2) provided
insufficient notice that attorneys' fees in a securities fraud
lawsuit were contemplated as within the scope of the clauses.
Amorim Holding also argues that under any cause of action, Baker
cannot recover for emotional distress or reputational harm
damages because Baker has failed to provide any evidence of such
damages.

### A.   *Misrepresentation and Breach of Warranty Claims*

Amorim Holding contends that Baker failed to allege
recoverable damages, or to provide any cognizable evidence of
harm, and therefore his misrepresentation and breach of warranty

claims must fail.[20]  Damages are a required element for

misrepresentation and breach of warranty claims, and therefore

the failure to prove damages would be fatal to Baker's claims.

*See, e.g.*, *Marram*, 809 N.E.2d at 1031 n.25 (noting that the

elements of the tort of negligent misrepresentation include

"pecuniary loss to others" as a result of defendant's false

information); *Michelson* v. *Digital Fin. Servs.*, 167 F.3d 715, 720

(1st Cir. 1999) (noting that damages are an element of contract

claims).  Baker has identified three types of damages in his

counterclaims: emotional distress, reputational harm, and

attorneys' fees.[21]

     As to emotional damages, Baker stated during his deposition

that the stress of the lawsuit had strained his marriage and had

caused him to start taking heart medications.  Amorim Holding

notes that emotional damages are not generally available in

---

[20]  I note at the outset that while Baker brought claims for
negligent or intentional misrepresentation sounding in tort law,
and for breach of warranty sounding in contract law, all of the
claims concern alleged misrepresentations made by Amorim Holding
in the terms of the purchase agreements.  Thus, I look to
principles of contract law, not tort law, in analyzing Baker's
claims.  *See, e.g., Cumis Ins. Soc., Inc.* v. *BJ's Wholesale Club,
Inc.*, 918 N.E.2d 36, 49 (Mass. 2009) ("Plaintiffs who are unable
to prevail on their contract claims may not repackage the same
claims under tort law.").

[21]  Baker asserts a fourth source of damages in this case: the
offset of any damage award which may result from Amorim Holding's
suit.  This fourth source of damages is only relevant to Baker's
indemnification claim.

breach of contract actions.  *See John Hancock Mut. Life Ins. Co.
v. Benerji*, 858 N.E.2d 277, 288 (Mass. 2006) (noting that under
Massachusetts law, "damages for mental suffering are generally
not recoverable in an action for breach of contract" and
"[d]amages for emotional distress may be recovered if they result
from physical harm or are the result of intentional or reckless
conduct of an extreme and outrageous nature" (citation omitted)).
Here, no allegations of physical harm or extreme or outrageous
conduct have been made.  Thus, Baker cannot recover for emotional
distress.  Even if such allegations had been made, they would
result not from Amorim Holding's alleged misrepresentations in
the contract, but from the lawsuit itself, and thus the causal
connection between Baker's emotional distress and the contract
would be lacking.

     As to reputational harm, Baker stated during his deposition
that since the lawsuit was filed against him, he had gone from
earning between $60 million and $80 million over the prior
fifteen years to having a "difficult time making ends meet."  He
said that potential investors were "fad[ing] away at a much
higher percentage" than what Baker had previously experienced,
and claimed that the increased rate of "fade away" (that is, his
decreased business) was linked to Amorim Holding's allegations
that he had deceived an unsophisticated investor — the very

alleged misrepresentation that Baker based his counterclaims on.
While he could not identify a specific person who had said that
he or she was not doing business with Baker as a result of the
misrepresentations alleged in Baker's counterclaim, Baker did say
that potential clients had brought up the lawsuit and its
allegations to him and inquired whether they were true.

Amorim Holding argues that these reputational harms are too
speculative for recovery.  The First Circuit has noted that in
contract actions, "damages for injury to reputation are usually
not available . . . because such damages are remote, speculative,
and not within the contemplation of the parties." *Flynn* v. *AK
Peters, Ltd.*, 377 F.3d 13, 22 (1st Cir. 2004) (quotation and
citation omitted).  Such damages only become available "when
plaintiffs have provided evidence of specific harm that is
proximately related to their reputational injury." *Id.*  And to
the extent that Baker measures his reputational damages by his
lost profits, Amorim Holding contends that Baker failed to show
that his measure of profits with reasonable certainty. *See John
Hetherington & Sons* v. *William Firth Co.*, 95 N.E. 961, 964 (Mass.
1911) ("But profits cannot be recovered, when the contract
interpreted in the light of all its surroundings does not appear
to have been made in contemplation of such damages, or when they
are remote, or so uncertain, contingent, or speculative as not to

be susceptible of trustworthy proof.  They must be capable of ascertainment by reference to some definite standard, either of market value, established experience or direct inference from known circumstances.").

Here, Baker's future profits are speculative and cannot be proven with any degree of reasonable certainty.  As the popular saying goes in the securities business (and this case), past performance does not predict (yet alone guarantee) future results.  Nor do the alleged harms to Baker's reputation stem from Amorim Holding's alleged misrepresentation.  Instead, they were proximately caused by Amorim Holding's lawsuit, thus severing the causal connection between the misrepresentations in the purchase agreements and Baker's reputational damages.

Finally, as to attorneys' fees, Amorim Holding asserts that unless a statute or contractual provision provides otherwise, under the so-called "American rule," attorneys' fees are not recoverable under either a misrepresentation or breach of warranty common law cause of action.  *See Alyeska Pipeline Serv. Co.* v. *Wilderness Soc.*, 421 U.S. 240, 256 (noting "the general rule that, absent statute or enforceable contract, litigants pay their own attorneys' fees").  Here, although no fee-shifting statute applies, a number of the investments include provisions for attorneys' fees.  As to those investments, Baker's claim for

attorneys' fees collapses into his indemnification claim, to
which I now turn.

**B.    *Indemnification***

Baker contends that Amorim Holding must indemnify him for
any damage award and his attorneys' fees stemming from Amorim
Holding's lawsuit as a result of indemnification clauses
contained in many of the purchase agreements.  Amorim Holding
argues that these indemnification provisions are unenforceable as
a matter of public policy.

Amorim Holding suggests that indemnification provisions such
as those in the purchase and subscription agreements here, are
unenforceable in the securities fraud context as a matter of
public policy because they would deter plaintiffs from bringing
meritorious securities fraud claims and thus undermine the
purpose of the securities laws.

The limited case law across the country is split on the
question.  Some courts have held that indemnification clauses in
securities fraud cases violate public policy because they would
have a chilling effect on plaintiffs and deter them from bringing
meritorious suits.  *See, e.g., Doody* v. *E.F. Hutton & Co.*, 587 F.
Supp. 829, 833 (D. Minn. 1984) (holding that the indemnity
provision "would discourage prospective plaintiffs from bringing
securities fraud actions whenever there is an integration clause

in a subscription agreement Prospective plaintiffs would be discouraged because the plaintiffs would be running the risk of incurring substantial liability for attorneys' fees and costs. Since the securities laws are a remedial measure intended to encourage the prosecution of securities fraud actions, the Court refuses to enforce this indemnity provision," but allowing the provision to "be used at trial as evidence of plaintiffs' non-reliance on the alleged oral misrepresentations").

Others have held that in situations similar to those presented here, "[t]he only potential chilling effect is on those investors who make representations in a subscription agreement which they later repudiate. It would discourage such investors from using their own fraudulent conduct in order to bring unjustified lawsuits." *Zissu* v. *Bear, Stearns & Co.*, 627 F. Supp. 687, 693 (S.D.N.Y. 1986), *aff'd on other grounds*, 805 F.2d 75 (2d Cir. 1986); *see Barnebey* v. *E.F. Hutton & Co.*, 715 F. Supp. 1512, 1522 (M.D. Fla. 1989) (analyzing the split and "find[ing] the reasoning of the *Zissu* to be more persuasive on the issue of public policy" and therefore denying summary judgment on an indemnification counterclaim).

The Massachusetts Supreme Judicial Court has not expressly held that indemnification clauses are unenforceable as a matter of public policy in the securities fraud context, but in dicta it

has cited a case which so held.  *Marram*, 809 N.E.2d at 1029

(citing *Doody*, 587 F. Supp. at 833, as supporting the proposition

that "Other jurisdictions have held that written contract terms,

including an integration clause, cannot be construed to waive the

plaintiff's rights under Federal or State securities law").

Relying on Mass. Gen. Laws ch. 110A, § 410 (g), which prohibits a

person from waiving compliance with any provision of the

Massachusetts Securities Act, the SJC has also made eminently

clear "that an integration clause [which disavows a plaintiff's

reliance on any representations made by a defendant seller of

securities] cannot release [a] defendant[] from liability under

[the Act]."  *Marram*, 809 N.E.2d at 1029.  In the words of the

SJC: "Indeed to permit the seller of securities to discharge, or

to defeat, his statutory obligation of truthfulness to the buyer

merely by attaching an integration clause to a subscription

agreement would enfeeble the statute."  *Id.* at 1028.

On remand from the SJC's decision in *Marram*, then-Judge

Gants of the Superior Court inferred from the Supreme Judicial

Court's decision that it would bar indemnity clauses in

securities fraud cases on public policy grounds.  *Marram* v.

*Kobrick Offshore Fund, Ltd.*, 2009 WL 1015557, at *15 (Mass.

Super. Ct. Jan 30, 2009).  In granting summary judgment

invalidating an indemnification clause similar to the one at issue in this case, Judge Gants observed that:

> If the Supreme Judicial Court was not going to permit an integration clause in a Subscription Agreement to "enfeeble" the Act for fear that it would result in its "virtual nullification," it certainly would not share *Zissu*'s view that the plaintiffs in these cases are simply investors repudiating written representations in a subscription agreement who should never have brought a securities claim. Put bluntly, *Zissu* recognizes that enforcement of the indemnification provision will chill these federal securities claims but it wants them chilled; Massachusetts law recognizes the chilling effect but does not wish to discourage comparable state securities claims.

*Id.* As further support, Judge Gants noted that the Massachusetts Securities Act provides that only the plaintiff investor may be awarded attorneys' fees if he prevails on his claim, which is distinct from federal securities law which provides for attorneys' fees for the prevailing party as long as the losing party's case was "without merit." *Id.* "This distinction reflects the legislative recognition that, if the buyer bore the risk that he may have to pay the seller's attorney's fees if he were to lose, the downside risk of bringing such a claim would discourage all but the most confident investors from invoking the protections of the Act." *Id.*

On appeal following entry of judgment in the Superior Court, the defendant in *Marram* challenged Judge Gants' invalidation on summary judgment of the indemnification clause. *See Crown* v. *Kobrick Offshore Fund, Ltd.,* 8 N.E.3d 281 (Mass. App. 2014).

-68-

Relying on the SJC's discussion in *Marram*, the Massachusetts
Appeals Court agreed with Judge Gants that enforcing an
indemnification clause that — like the indemnification clause in
this case, effectively required the plaintiff to pay the
defendants' legal fees regardless of whether or not the plaintiff
prevailed on his Massachusetts Securities Act claims — was
invalid as contrary to public policy.  *See id.* at 291-93.  While
the Appeals Court readily and perhaps predictably dispatched the
portion of the clause requiring a prevailing plaintiff to
indemnify the defendant against all costs incurred in defending a
meritorious litigation, *see id.* at 291-92, it also concluded that
the "loser pays" portion of the clause was invalid as contrary to
Massachusetts public policy because such clauses discourage the
bringing of potentially meritorious claims under a remedial
statute that is intended to encourage the prosecution of
securities fraud actions.  *Id.* at 295 (citing *Marram*, 809 N.E.2d
at 1029).[22]

Although I conclude that *Marram* and *Crown* compel the
invalidation of the indemnification clause in this case, I note

---

[22]  Relying on the SJC's analysis in *Marram* with respect to the
integration clause, the Appeals Court implicitly rejected the
argument that the relative sophistication of the investor was
relevant to the validity of the indemnification clause, at least
with respect to Massachusetts Securities Act claims.  *Crown*, 8
N.E.3d at 294.

that the support provided by those cases directly extends only to claims made under the Massachusetts Securities Act. Even if an indemnification clause is unenforceable as against public policy with regard to claims under the Massachusetts Securities Act, there is no apparent conflict between such a clause and Amorim Holding's claims for fraud, negligent misrepresentation, and breach of fiduciary duty.[23] As to those claims, the indemnification provision merely acts as a contractual provision overriding the default American Rule and providing for shifting attorneys' fees. Thus, my invalidation on summary judgment of the indemnification clause is limited to damages and attorneys' fees arising from Amorim's claims under the Massachusetts Securities Act.

## V.  CONCLUSION

For the reasons set forth above, Baker's Motion for Summary Judgment (Dkt. No. 119) is GRANTED as to all claims arising from the Remote MDx, One IP Voice, and MySky investments. Baker's motion is further GRANTED as to Amorim's claim for negligent misrepresentation with respect to the Anasazi III investment, and so much of Amorim's claims that arise from alleged

---

[23]  Of course, it goes without saying that such indemnification clauses would not apply if Baker is ultimately found to have made fraudulent representations.

misrepresentations that are non-actionable, as described herein, because they either occurred post-investment or constitute statements of opinion or prediction.  Baker's motion is further GRANTED as to so much of Amorim's claim for breach of fiduciary duty as rests on a theory of mismanagement.  Finally, Baker's motion is GRANTED as to Amorim's claim under Chapter 93A only to the extent that it is based on claims for fraud, negligent misrepresentation or breach of fiduciary duty that have not survived summary judgment.  Baker's motion is otherwise DENIED.

Amorim's Motion for Summary Judgment on Baker's counterclaims (Dkt. No. 110) is GRANTED as to so much of Baker's alleged damages as are premised on emotional distress and reputational harm, and GRANTED insofar as Amorim owes no duty to indemnify Baker in connection with claims brought by Amorim under the Massachusetts Securities Act.  Amorim's motion is otherwise DENIED.

/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT